Thomas NIMELY, Plaintiff–Appellant,

v.

CITY OF NEW YORK, New York City Police Department, and Police Officer John Muirhead, Defendants–Appellees,

Leonard Oechsner, Steven M. Ferrigno, John Doe 1, and John Doe 2 Defendants.

Docket No. 04–3240–CV.

United States Court of Appeals, Second Circuit.

Argued: Jan. 31, 2005.

Decided: June 27, 2005.

384

Michael Steven Kelton, Lippman, Krasnow & Kelton, LLP, New York, NY, for Plaintiff–Appellant.

Karen M. Griffin, for Michael Cardozo, Corporation Counsel for the City of New York, New York, N.Y. (Jennifer A. Rossan, John S. Siffert, on the brief), for Defendants–Appellees.

Before: JACOBS and CALABRESI, Circuit Judges, and JED S. RAKOFF, District Judge.*

CALABRESI, Circuit Judge.

This is a civil rights action brought by Plaintiff–Appellant Thomas Nimely ("Nimely") against, among other individuals and entities, Defendants–Appellees the City of New York ("the City"), the New York City Police Department ("NYPD"), and Police Officer John Muirhead ("Muirhead"). The case arose out of a police chase that culminated in Nimely—having been shot by Muirhead—being paralyzed from the waist down. Nimely's federal complaint alleged, *inter alia*, that Muirhead's conduct constituted excessive force in violation of the U.S. Constitution and New York law. Following a trial in the Eastern District of New York (Wolle, *J.*), the jury returned a verdict in favor of Muirhead.[1] Nimely appeals, contending that he was entitled to judgment as a matter of law, or, in the alternative, that a new trial must be ordered. We decline to hold that, based on the evidence properly admitted, a reasonable jury could not have reached a verdict in favor of Muirhead, but we agree with Nimely that prejudicial evi-

---

1. While Nimely's complaint stated a number of causes of action under 42 U.S.C. §§ 1983 and 1988, only the claims of excessive force in violation of the Fourth and Fourteenth Amendments, and of New York law, proceeded to trial and are relevant to this appeal. Additionally, while a number of individual and state defendants were named in the complaint, the jury ultimately considered only the individual liability of Muirhead, who was defended at trial, and is represented on appeal, by Corporation Counsel for the City of New York. While the City and the NYPD are listed as Defendants–Appellees, only Muirhead's liability was before the jury, and is at issue in this appeal.

dentiary errors were committed below. We therefore vacate the judgment in favor of Muirhead and remand the case for a new trial.

## I. Background

Because the issues before us require an assessment not only of the sufficiency of the evidence presented, but also of whether some portion of that evidence was wrongly *and* prejudicially admitted, it is well worth setting forth in some detail the facts developed below.

### THE LIBERTY HALL PARTY

The events giving rise to this case began on the evening of February 13, 1998, when Nimely, then nineteen years old, attended a party at the Liberty Rental Hall in Staten Island, New York. According to Nimely's trial testimony, he arrived at approximately 11:30 p.m., carrying a loaded gun that had been purchased some years earlier. Nimely stated that, because a bouncer at the door of the party site would not allow him to enter with the weapon, Nimely hid the gun in bushes along the side of Liberty Rental Hall.

Nimely testified that at approximately 2 a.m., while he was standing outside the party, he heard gunshots fired inside Liberty Rental Hall. He ran back into the building and saw an individual lying on the floor, and, next to that individual, the gun that Nimely had hidden in the bushes earlier in the evening.[2] Nimely stated that he picked up the gun, put it in his waistband, and left the party, running several blocks to a livery cab stand, where he met several friends who had also been at the party. Nimely added that the gun was warm, and that, while running to the cab stand, he inspected the chamber of the gun and saw that it was no longer loaded.

### THE POLICE CHASE

The jury heard conflicting accounts of what happened when, at the cab stand, Nimely and his friends were approached by Muirhead and his partner, police officer John McCarthy ("McCarthy").[3] The contradictory narratives were presented chiefly through the testimony of a) Muirhead and McCarthy, who gave essentially identical accounts, b) Nimely, and c) four eye witnesses to various parts of the police chase.

### 1. The Police Officers' Testimony

Muirhead and McCarthy testified that early in the morning on February 14, 1998 they went to Liberty Rental Hall after hearing, from a police radio call, of the shooting there. Seeing that other police units were already at the scene, Muirhead and McCarthy decided to drive around the neighborhood in their police car in search of the shooter. During their canvass, Muirhead and McCarthy came across Nimely and his friends at the cab stand.[4] The officers flashed their headlights on the group, got out of the car, and asked Nimely and the others to approach the vehicle.

---

2. Another witness, Michael Dicks, who testified at trial for the defense, stated that Nimely was inside the club when shots were fired.

3. Muirhead and McCarthy, both police officers in 1998, have since been promoted to the ranks of Sergeant and Detective, respectively.

4. Although the actual radio transmission described the shooting suspect as a black male, five feet three inches tall in a striped white shirt and with dredlocks, Muirhead and McCarthy both remembered only the race, gender, and clothing description. Nimely is a black male, six feet, two inches tall, with dredlocks, and, on the night of the shooting, was wearing a white shirt with black stripes on the arms. Both Muirhead and McCarthy testified that they viewed Nimely as fitting the transmitted description of the suspect.

Muirhead said that neither he nor McCarthy had their guns drawn when they left their car; McCarthy, by contrast, stated that his gun was drawn, and that he believed that Muirhead's was as well.

Muirhead testified that, at that point, Nimely, who was facing away from Muirhead, looked over his right shoulder, reached into his waistband, pulled out a silver gun with his right hand, held the gun up to shoulder height, and started to run. This description was echoed by McCarthy, who, under oath, asserted that Nimely looked over his right shoulder, brought both of his hands to his waist (and out of McCarthy's view), removed, with his right hand, a gun from his waistband, and began running. Muirhead and McCarthy both chased Nimely, with Muirhead passing McCarthy during the pursuit. In his testimony, Muirhead contended that Nimely, as he ran, periodically looked over his right shoulder at Muirhead, and pumped his arms in a manner such that Muirhead continually saw Nimely's gun rise to the level of Nimely's right shoulder. Muirhead further stated that, carrying his service revolver, he ran after Nimely and shouted to him to stop and to drop his weapon.

The chase proceeded toward a fence that bordered the Stapleton Homes housing projects. According to both police officers, Nimely, approximately five feet ahead of Muirhead, crashed into a metal bar protruding from the fence and fell to the ground. Muirhead testified that, seeing that Nimely was on the ground, he began the process of holstering his gun. At the same time he moved toward Nimely to arrest him. At that point, according to Muirhead, Nimely, turning in a crouched position, rose to nearly his full height, faced Muirhead, extended his arm, and pointed his gun at Muirhead. Muirhead testified that he then fired his own weapon, striking Nimely in the chest. The total time from when Nimely collided with the fence to when he was shot, Muirhead said, was just a matter of seconds.

McCarthy, who had viewed the scene from a different angle, described a very similar sequence of events. He averred that, standing to the left of and behind Muirhead (and approximately ten feet from Nimely), he saw Nimely crash into the fence and hit the ground. McCarthy stated that Nimely then immediately jumped back up into fully erect posture, turned, and pointed a gun at Muirhead. At that point, McCarthy saw Muirhead, who was facing Nimely, fire his weapon, and shoot Nimely in the chest. Nimely, according to McCarthy, fell immediately to the ground.

### 2. Nimely's Version of Events

Nimely testified that, while standing at the cab stand, he heard someone behind him say, "Freeze," and then heard one of his friends say, "Run." Nimely stated that he ran, holding in his right hand the waistband of his pants, which were slung below his waist. According to Nimely, he never—either while standing at the cab stand or any time thereafter—removed the gun from his waistband. Nimely added that his last memory of the chase was of running, that he had no recollection of hitting a fence, and that the next thing he remembered was awakening in Staten Island University Hospital.[5]

---

**5.** The defense cross-examined Nimely fairly extensively concerning deposition testimony, given in February 2000, in which Nimely described colliding with the fence and falling, and in which he stated that he had not gotten off the ground to turn toward Muirhead. Nimely's explanation for the inconsistency between this testimony and his assertion at trial that he remembered nothing after the chase was that at his deposition he had relayed

## 3. The Eyewitness Accounts

Nimely's case included the accounts of four individuals who observed portions of Muirhead and Nimely's chase and confrontation. Two of these, Stephen Springle ("Springle") and Alison Curtis ("Curtis"), testified at trial. Abdul Elgazar ("Elgazar") gave a videotaped deposition, and Wayne Collier ("Collier") made a recorded statement for NYPD investigators shortly after the shooting. The videotape and audio recordings were played at the trial.

Springle testified that he saw the beginning of the chase from a parking lot next to the cab stand where Nimely had been standing with his friends. Springle stated that he observed Muirhead and McCarthy park their police car and go up to Nimely's group with guns drawn. According to Springle, as the officers approached Nimely's group, someone yelled, "Run"; Nimely, who was facing the police officers at the time, took off. Springle said that Nimely did not at that point display a weapon, and that Nimely did not hold a gun in his hand as he ran away. Rather, according to Springle, Nimely was using his left hand to hold up the waist of his pants. Springle also described Nimely as looking back over his shoulder as he ran. Springle lost sight of Nimely and Muirhead, and then heard a gunshot.

Curtis, then a member of the NYPD, had, on the night in question, been among the police officers who received the radio transmission reporting the Liberty Hall shooting. She and her partner drove toward Stapleton Homes and, en route, saw Nimely and Muirhead running. Curtis testified that the two ran toward her patrol car, with Nimely in the lead, and that she saw Nimely strike a fence and fall to the ground. Curtis then looked away for a second, in order to maneuver her patrol car, and when she looked back, both Nimely and Muirhead were on the ground, with Nimely at a part of the fence different from where he had previously fallen. Curtis added that she never saw a gun in Nimely's hands.

Elgazar, who observed the encounter between Nimely and the police from a location near the parking lot where Springle had stood, testified that he noticed Muirhead and McCarthy park their patrol car at the cab stand, get out of the car with the guns drawn, and approach Nimely's group. According to Elgazar, Nimely's companions then placed their hands on nearby parked cars in a manner suggesting a police search, while Nimely took off running. Muirhead chased Nimely, who was holding the waistband of his pants in his right hand and pumping his left arm as he ran. Elgazar stated that he never saw a gun in Nimely's hands. Five to ten seconds after losing sight of Muirhead and Nimely, Elgazar heard a gun shot.

Collier did not testify at trial, nor did he give a deposition, but his interview with NYPD investigators, conducted approximately an hour after the shooting, was read into the trial record. Collier asserted that he viewed the entire encounter from across the street from the cab stand, about sixty to eighty feet from the place of the shooting. He said that he saw a group of four men running toward the cab stand, that a police car then pulled up to the stand, and that he observed two officers leave the car. Nimely then ran away, and Muirhead chased after him. Collier stated

---

details of his injuries that had been told to him by other people. The defense also impeached Nimely's alleged memory loss by pointing out that the hospital treating records from the night of the shooting made no mention of any such symptom. One of Nimely's two medical experts, however, testified that it was possible for Nimely's injuries to have caused permanent or temporary loss of memory of the moments just prior to the shooting.

that he watched Nimely slip and fall, and then, as Nimely scrambled to get up, that he saw Muirhead shoot Nimely in the back. According to Collier, Nimely did not have a gun in his hand at any point during the chase. Collier also told investigators that, immediately after the shooting, Collier confronted Muirhead, asking why he had shot Nimely in the back, and that Muirhead pointed his gun at Collier and told him to leave. In his interview Collier admitted that he had consumed a forty-ounce bottle of Budweiser prior to seeing the shooting. A stipulation that Collier had a prior felony conviction was read into the trial record.

Several other individuals who were present at the scene *after* the shooting provided important narrative details at trial. One witness of note was NYPD Sergeant Leonard Oechsner ("Oechsner"), who responded to the scene after Nimely was shot. Oechsner testified that Nimely had landed on the ground on his back, and that a firearm was about five feet from his feet.

### EXPERT TESTIMONY

#### 1. The Medical Testimony

Another category of evidence heard at trial was the testimony of three medical experts who rendered opinions concerning the likely actions of Muirhead and Nimely in the critical moments surrounding Nimely's shooting. Nimely proffered two doctors, Dr. Ali Guy ("Guy") and Dr. Frederick Zugibe ("Zugibe"); the City countered with Dr. Stuart Dawson ("Dawson"). It was primarily through the testimony of these doctors that the plaintiff and the defense debated a crucial factual dispute in the case: whether Muirhead fired his gun as Nimely, unarmed, was trying to flee; or whether Muirhead fired as Nimely, hold-

ing a revolver in his right hand, was turning toward Muirhead and preparing to shoot.

Guy, a specialist in physical medicine and rehabilitation, and Zugibe, a forensic pathologist, both testified that the bullet shot by Muirhead entered the left side of Nimely's back, struck Nimely's spinal cord, and moved toward the right side of Nimely's body. Addressing Muirhead and McCarthy's version of the events leading up to the shooting, Guy and Zugibe both testified that, although the bullet's path did suggest that Nimely's body may have been partially turned when he was shot, it was medically impossible for Nimely to have been anywhere near facing Muirhead before or after the shot was fired. According to Zugibe it was possible that Nimely was turned as much as sixty degrees toward Muirhead at the time that the bullet struck. But that was the maximum, and, Zugibe added, another explanation for the bullet's trajectory was that Muirhead had fired his weapon from behind and to the left of Nimely. Further, both Guy and Zugibe stated that, even if Nimely had been turning when he was shot, it was not possible, given the injury to the spinal cord caused by the bullet, for Nimely to have continued to turn, face Muirhead, and aim his gun after being struck by Muirhead's bullet. By the same token, Zugibe conceded on cross-examination that, if Nimely had been holding a gun at the moment that the bullet hit his spinal cord, the reflexive reaction to the injury could either have been to let go of, or to clamp down on, the weapon.

The defense's medical expert, Dawson, whose testimony is central to several of Nimely's claims on appeal, was at the time of trial, and appears still to be,[6] Deputy

---

6. This information was obtained from the Suffolk County, Office of the Medical Examiner web site, http://www.co.suffolk. ny.us/web-

Chief Medical Examiner for Suffolk County. He testified, however, in his private capacity as a consulting expert in forensic pathology. A primary function of Dawson's testimony was to reconcile the medical evidence that Nimely was shot in the back with Muirhead's and McCarthy's testimony that Muirhead fired his weapon while Nimely faced him. Dawson conceded that Nimely could not have been facing Muirhead when Nimely was shot. But, relying on principles of physics, Dawson explained that if Nimely had been turning with a gun in the split second before being shot by Muirhead, Nimely would have still completed his turn as he fell to the ground. Furthermore, Dawson opined that, because of the limited powers of human perception, and because the events between the alleged turn and the time that Nimely was shot occurred over the course of mere seconds, Muirhead and McCarthy might both have perceived Nimely to have been fully turned when Muirhead pulled the trigger, notwithstanding that, in reality, Nimely could not have been facing Muirhead until after the bullet had already entered Nimely's body. Critically, as will be discussed in greater detail below, Dawson testified that he adopted his "misperception" hypothesis in part on the basis of his review of Muirhead's and McCarthy's pretrial depositions, in which they both related substantially the same version of events that they later gave in their trial testimony. He further testified that he also relied on his independent conclusion that Muirhead and McCarthy must not have been lying in their accounts.

### 2. The Police Procedures Testimony

In addition to medical testimony, Nimely and the defendants presented expert witnesses in the field of police procedures, who offered opinions concerning Muir-

head's compliance with NYPD training and with respect to the appropriateness of the officer's use of force against Nimely. Nimely's expert, Henry Branche ("Branche"), and the defense expert, Arron Rosenthal ("Rosenthal"), both responded to a series of hypothetical questions involving the use of force by a police officer against a suspect. Branche asserted, in sum, that, assuming Nimely possessed a gun, but that he had been turned away from Muirhead, it would not have been proper police procedure for Muirhead to shoot Nimely in the back. Rosenthal, for his part, testified that, if Nimely had been turning, with gun in hand, toward Muirhead, the officer's shooting of Nimely would have been consistent with NYPD policy and would have been a justified use of force.

## II. Discussion

### A. Nimely's Motion for Judgment as a Matter of Law

Nimely's first claim on appeal is that the district court erred in denying his motion, pursuant to Federal Rule of Civil Procedure 50, for judgment as a matter of law. Nimely argues, primarily on the basis of the testimony of his four eyewitnesses and two medical experts, that the evidence at trial established beyond any question of fact that Muirhead's shooting constituted excessive force. Nimely also contends that much of Dawson's expert testimony was improperly admitted, and that, in the absence of that testimony, Muirhead and McCarthy's version of the events leading up to Nimely's shooting could not have been credited by any reasonable juror.

### 1. Applicable Law

■■■ We review *de novo* the district court's denial of a motion for judgment as

temp3.cfm? dept=6 & id=2247 (last visited June 20, 2005).

a matter of law, applying the same standards that guided the district court's consideration of the issue. *See Leibovitz v. New York City Transit Authority,* 252 F.3d 179, 184 (2d Cir.2001); *Stratton v. Department for the Aging for the City of New York,* 132 F.3d 869, 878 (2d Cir.1997). A Rule 50 motion may be granted only when, considering the evidence in the light most favorable to the non-moving party and drawing all reasonable evidentiary inferences in that party's favor, there was "no legally sufficient evidentiary basis for a reasonable jury to find" in favor of the non-moving party. Fed.R.Civ.P. 50(a); *see Diesel v. Town of Lewisboro,* 232 F.3d 92, 103 (2d Cir.2000); *cf. Kerman v. City of New York,* 374 F.3d 93, 118 (2d Cir. 2004) ("[T]he standard for judgment as a matter of law is the same as the standard for summary judgment."). We may not "assess the weight of conflicting evidence, pass on the credibility of the witnesses, or substitute [our] judgment for that of the jury," *LeBlanc–Sternberg v. Fletcher,* 67 F.3d 412, 429 (2d Cir.1995) (internal quotation omitted), and we may reverse the district court only if there is "such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, or [there is] such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded [jurors] could not arrive at a verdict

against [him]." *Id.* (internal quotation omitted).

■ As to the substantive legal principles governing Nimely's claims, in order to establish that Muirhead's use of force was constitutionally excessive within the meaning of the Fourth Amendment, Nimely was required to show that Muirhead's actions were "objectively unreasonable in light of the facts and circumstances confronting [him], without regard to [his] underlying intent or motivation."[7] *Maxwell v. City of New York,* 380 F.3d 106, 108 (2d Cir.2004) (internal quotation marks omitted).

■ With respect to deadly force in particular, "an officer's decision to use deadly force is objectively reasonable only if the officer has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others." *Cowan ex rel. Estate of Cooper v. Breen,* 352 F.3d 756, 762 (2d Cir.2003) (internal quotation omitted); *see also Tennessee v. Garner,* 471 U.S. 1, 11, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985) ("Where the suspect poses no immediate threat to the officer and no threat to others, the harm resulting from failing to apprehend him does not justify the use of deadly force to do so."). In all cases, the reasonableness of the officer's decision to use force in effectuating a seizure "depends only upon the officer's knowledge of circumstances immediately prior to and at the moment that he made the split-second

---

7. *Graham v. Connor,* 490 U.S. 386, 394–95, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989), and its progeny hold that excessive force claims must be analyzed under the rubric of the constitutional right that is most directly implicated by the facts giving rise to the claim. Because this case arises in the context of a police pursuit, it is governed by the Fourth Amendment "reasonableness" standard. *See id.* at 395, 109 S.Ct. 1865; *see also Brown v. Doe,* 2 F.3d 1236, 1242 n. 1 (2d Cir.1993) ("Where ... the excessive force claim arises

in the context of an arrest or investigatory stop of a free citizen, it is most properly characterized as one invoking the protections of the Fourth Amendment. The Due Process Clause governs claims arising in the pre-trial detention context. After conviction, the Eighth Amendment serves as the primary source of substantive protection ... in cases ... where the deliberate use of force is challenged as excessive and unjustified." (internal citations and quotation marks omitted)).

decision to employ deadly force." *Cowan,* 352 F.3d at 762 (internal quotation omitted).

■ To prove his state law civil battery claim against Muirhead, Nimely was required to show that the officer made "bodily contact, that the contact was offensive, and that [Muirhead] intended to make the contact." *Laurie Marie M. v. Jeffrey T. M.,* 159 A.D.2d 52, 55, 559 N.Y.S.2d 336 (2d Dep't 1990). Additionally, Nimely was required to prove that Muirhead's conduct was not reasonable within the meaning of the New York statute concerning justification of law enforcement's use of force in the course of their duties. *See* N.Y. Penal Law § 35.30(1); *see also Brunelle v. City of New York,* 269 A.D.2d 347, 348, 702 N.Y.S.2d 648 (2d Dep't 2000).

## 2. Analysis

■ Nimely contends that the jury's verdict in favor of Muirhead could only have been the result of "sheer surmise and conjecture," *LeBlanc–Sternberg,* 67 F.3d at 429, because the four eyewitnesses who testified on behalf of Nimely consistently affirmed that Nimely had never brandished a weapon at Muirhead, because the medical evidence established that Nimely was shot in the back, and because Muirhead's and McCarthy's testimony was clearly perjurious. Additionally, Nimely argues that only Dawson could possibly have provided a means of reconciling Muirhead and McCarthy's version of events with the undisputed facts. But, Nimely adds, the critical portions of Dawson's testimony were erroneously admitted, and must be excluded from the mix of legally sufficient evidence to be considered in a Rule 50 motion. *See* Fed.R.Civ.P. 50(a) (authorizing judgment as a matter of law where "there is no *legally sufficient*

evidentiary basis" for a reasonable jury to find in the non-movant's favor (emphasis added)).

We, however, conclude that, deferring to the trial jury's capacity to make any and all credibility determinations, and drawing all reasonable evidentiary inferences in favor of the defense, Nimely was not entitled to judgment as a matter of law. Moreover, we reach this conclusion on the assumption that Dawson's testimony was legally excludable. We do so because we believe that the jury was entitled to credit the testimony of Muirhead and McCarthy even without the corroborating force of Dawson's opinions.[8]

The core issue at trial was that of the reasonableness of Muirhead's actions, that is, whether Muirhead was, by virtue of Nimely's behavior leading up to and at the moment of the shooting, justified in employing deadly force. Contrary to Nimely's assertion, the evidence presented at trial did not paint an uncontroverted account of what Nimely was doing in the minutes before being shot by Muirhead. Only one of Nimely's four eyewitnesses— Collier—actually claimed to have seen the shooting itself, and his statements were unsworn, not cross-examined, and impeached by a prior felony conviction and by his (admittedly) having consumed alcohol prior to making his observations. Nor was Nimely's own testimony without problems. The jury was permitted to learn of Nimely's two felony convictions, including one arising from his possession of a weapon on the night of his shooting. And, although Nimely contended, with at least hypothetical support from his medical experts, that he had no memory of the critical moments surrounding the shooting, that assertion was countered by Nimely's

---

8. Accordingly, we defer discussion of the alleged errors in Dawson's testimony for our analysis, below, of the denial of Nimely's motion for a new trial.

deposition testimony, describing his collision with the fence, and, to some extent, by hospital records containing no notations pertaining to memory loss.

Moreover, the medical evidence, even apart from Dawson's testimony, was complicated at best. While it was clear that Nimely was shot in the back, it was uncontested that Nimely landed face-up on the ground. Nimely's own medical experts testified that Nimely may have been turned as much as a quarter of the way toward Muirhead when he was struck with Muirhead's bullet. And, although those doctors asserted that that Nimely could not have turned, after having been shot, to face Muirhead erect and with a gun squarely aimed, they also testified that the force of the bullet could have turned Nimely's body the rest of the way around to allow him to land on his back.

Thus, the evidence presented by Nimely did not, as a matter of law, *exclude* the possibility that Nimely, as Muirhead and McCarthy contended, had been turning toward Muirhead, gun in hand, on the brink of firing, when Muirhead responded with deadly force. A jury, properly instructed and presented with admissible evidence, could have concluded that Muirhead's and McCarthy's testimony supported such a possibility, *notwithstanding* the fact that both may have been inaccurate in their assertions that Nimely had actually faced and aimed at Muirhead before being shot. Such a conclusion could be the product of

evidence— and credibility-weighings that are not within our province to question.[9]

The district court therefore properly denied Nimely's motion for judgment as a matter of law.

## B. Nimely's Motion for a New Trial

Although the evidence properly presented at trial, construed in the light most favorable to the defense, could support the verdict reached by the jury, we believe that critical portions of Dawson's expert testimony were erroneously admitted. Moreover, these errors are likely to have had a substantial effect on the jury's resolution of the factual disputes at trial. Accordingly, Nimely is entitled to a new trial.

### 1. Standard of Review

 In contrast to a motion for judgment as a matter of law, a motion for a new trial pursuant to Fed.R.Civ.P. 59 may be granted by the district court, although there is evidence to support the jury's verdict, so long as the district court determines that, in its independent judgment, "the jury has reached a seriously erroneous result or [its] verdict is a miscarriage of justice." *Munafo v. Metropolitan Transportation Authority*, 381 F.3d 99, 105 (2d Cir.2004) (internal quotation marks omitted); *see also Manley v. Ambase Corp.*, 337 F.3d 237, 244–45 (2d Cir. 2003). We review for abuse of discretion a district court's disposition of a motion for a new trial. *Leibovitz*, 252 F.3d at 184.

---

**9.** Nimely does not argue on appeal that, *if* the evidence was susceptible of a finding that he had been turning toward Muirhead with his gun in hand, such evidence would have been insufficient as a matter of law to establish that Muirhead's use of deadly force was reasonable. Instead, Nimely argues only that the evidence at trial was susceptible of just one interpretation—essentially, the version of events testified to by Collier. Accordingly, while we have no particular reason to doubt

that the jury could have construed the facts described above as supporting a legally sufficient finding that Muirhead's use of force was reasonable, *cf. Tennessee v. Garner*, 471 U.S. at 9–12, 105 S.Ct. 1694, we have no occasion, in this appeal, to consider the application of federal constitutional and New York state excessive force precedents to the various factual scenarios that the jury could plausibly have found.

The district court's evidentiary rulings, and in particular its determinations regarding the admissibility of expert testimony, are also reviewed for abuse of discretion. *See Zaremba v. General Motors Corp.*, 360 F.3d 355, 357 (2d Cir.2004); *Parker v. Reda*, 327 F.3d 211, 213 (2d Cir.2003) (per curiam).

## 2. Admission of Dawson's Testimony

### a) The challenged testimony

The portion of Dawson's testimony most relevant to this appeal pertains to his opinion purporting to explain and justify—despite the uncontroverted medical evidence that Muirhead's bullet struck Nimely in the back—Muirhead's and McCarthy's statements that, prior to being shot, Nimely faced Muirhead with an aimed weapon.[10] In an expert report disclosed prior to trial, Dawson stated:

> What is likely here is that we have an Officer mentally prepared for quick action given the circumstances of this night, and with gun already in hand, who is able to react so quickly to a threatening move by the plaintiff that he is able to fire while the plaintiff is still turning rather than after he has completed his turn ... [sic] In these kinds of situations such things happen so quickly, and such motions are so fast, that the turning momentum of Mr. Nimely would almost immediately complete the turn even though the shot had already been fired. An instant after the shot had been fired Mr. Nimely would be facing Officer Muirhead, but the two are so nearly summarily simultaneous that it later would be remembered as, "he was facing me and I fired" rather than, "I fired and then he was facing me."

Nimely moved *in limine*, before trial, to exclude Dawson's opinion concerning Muirhead's and McCarthy's abilities to perceive the correct sequence of events surrounding Nimely's shooting. Nimely's motion argued, among other things, that the opinion was unsupported by scientific evidence, beyond the scope of Dawson's expertise, and not the proper subject of expert testimony. The district court granted Nimely's motion to the extent that it raised "a straight question of how far this qualified expert can go in testifying about things that are too speculative. And unless previously permitted after hearing outside the presence of the jury, the doctor may not testify and should be instructed not to testify concerning anything within Officer Muirhead's mind just before the shooting."

Dawson's trial testimony began with a summary of his own conclusion, consistent with that of Nimely's medical experts, that Nimely was injured by a bullet that entered the left side of his back and, as it moved to the right, struck his spinal cord. Then, the following direct examination was conducted by defense counsel:

Q: Now, Doctor Dawson, did you also review the deposition testimony of Police Officers Muirhead and McCarthy?

A: Yes.

Q: Was there testimony about what Mr. Nimely was doing at the time Sergeant Muirhead thought he shot him consistent with your findings?

. . . .

A: Well, yes and no. There was testimony that Mr. Nimely was turning, but taken literally, the testimony wasn't consistent with the facts be-

---

**10.** Dawson employed differing language to describe his conclusion, terming it, at different points in his testimony, an "optical illusion," a "misperception," and "the turn hypothesis." We will, for purposes of this opinion, refer to Dawson's explanation as the "misperception hypothesis."

cause the literal testimony was that the officer felt that he shot directly in front of the chest of Mr. Nimely but he did say that Mr. Nimely was in the process of turning, so in effect my analysis considered both of those aspects and realized they could basically be synthesized in something reasonable.

Q: In doing your analysis, in light of—what you described as the entrance and exit wound and trajectory of the bullet, did you consider that the police officer who said that he shot him straight in the chest wasn't telling the truth?

A: That certainly is one of the considerations that goes through your mind, is perhaps the officer is simply lying about the incident. I considered that possibility and—but fairly quickly rejected it as being the less likely of the things that happened.

Q: Why did you reject it?

Mr. Kelton: Objection, your Honor.

The Court: Overruled. You may answer.

A: Well, I rejected it because, you know, in—it's generally an acceptable concept that police officers aren't going to discharge their weapons—

Mr. Kelton: Judge, I object to what is an acceptable concept of what police officers will do.

The Court: Overruled. The witness is explaining his answer. He may complete it.

A: Thank you, Judge. What it boils down to is police officers don't discharge weapons lightly because the discharge of a weapon creates all kinds of problems.

Mr. Kelton: I object to this. This is improper. I object.

The Court: I heard your objection. I overruled it. You may continue with your answer.

A: Thank you. It causes problems of criminal litigation, civil litigation, et cetera. The other thing is, it's reasonable to infer that a police officer is going to know that whenever a discharge does occur, there is going to be a big investigation and that will include forensic examination of wounds, so it didn't make much sense to me that the police officer would say that the person was shot in the front if it would be obvious to the police officer that an investigation would be done and that would show the person was shot in the back.

Mr. Kelton: Judge, for the record, once again, I object. This is pure argument.

Next, and still on direct, Dawson testified as to what conclusion he was led to, in light of his judgment that Muirhead and McCarthy's version of events was credible:

Q: So can you describe the scenario of what you arrived at with respect to taking into account the entrance and exit wounds and the trajectory of the bullet?

A: Well, what I arrived at is, I—looking at that trajectory, looking at the deposition testimony, it became pretty immediately clear to me that the whole thing would be consistent if Mr. Nimely were turning very quickly at the time he was shot, what would basically happen is that the illusion would be created—

Mr. Kelton: Objection, Judge. Objection. We have spoken about this before.

The Court: Overruled. Continue.

A: Quickly—a person shot quickly—during a quick turn would create, if you will, an optical illusion of—that

the person was facing you at the time he was shot.

On cross-examination, Nimely's attorney questioned Dawson extensively regarding his misperception hypothesis, as well as Dawson's initial supposition that Muirhead and McCarthy's account of Nimely's physical motions was truthful. Throughout the cross-examination, Dawson repeated that it was his opinion that Muirhead and McCarthy were not lying:

> Q: Rather than accepting the proposition that Officer Muirhead and his partner, Officer McCarthy, may have both been untruthful in their description of the shooting, you're accepting a proposition that both Officer Muirhead and Officer McCarthy had the same optical illusion at the same moment?
>
> A: Well, they're obviously not the same optical illusion because they're viewing the incident from two different angles, but what I would say is the difference in timing of when the shot is fired in the two scenarios we're talking about is so minuscule, in my judgment it would not be surprising that both officers would make the same misperception because it almost requires a slow motion video to see the difference, *and I rejected the idea that they were lying because it would be such an easily disproved lie.*
>
> . . . .
>
> Q: What you have given this jury is the only explanation that you could come up which would result in an explanation as to why these officers weren't telling a lie when they both suggested that Mr. Nimely turned and faced Officer Muirhead when he shot him, isn't that true?
>
> . . . .
>
> A: Well, it's—the way you are phrasing it, it sounds like my number one ob-

jective when I analyze a case like this it to prove that the officers weren't lying. That's one of those things I couldn't care less, one way or another. But I have to consider is it likely they are lying or isn't it, and after I put all the facts together, I came up with exactly the scenario I have described here and that scenario happens as a by-product to include that under those circumstances I think the officers would have been telling the truth as they perceived it.

(emphasis added)

The admission of the above testimony was erroneous in several crucial respects, and requires the granting of a new trial.

### b) The Admissibility of Expert Testimony

■ The admissibility of expert testimony in the federal courts is governed principally by Rule 702 of the Federal Rules of Evidence:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed.R.Evid. 702. It is a well-accepted principle that Rule 702 embodies a liberal standard of admissibility for expert opinions, representing a departure from the previously widely followed, and more restrictive, standard of *Frye v. United States,* 293 F. 1013, 1014 (D.C.Cir.1923). *See, e.g., Daubert v. Merrell Dow Pharma-*

*ceuticals, Inc.*, 509 U.S. 579, 588, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) (holding that the *Frye* test of general acceptance in the scientific community was superceded by the Federal Rules); *Amorgianos v. Nat'l R.R. Passenger Corp.*, 303 F.3d 256, 265 (2d Cir.2002) (observing departure, under Federal Rule, from the *Frye* standard). The shift under the Federal Rules to a more permissive approach to expert testimony, however, did not represent an abdication of the screening function traditionally played by trial judges. To the contrary, as *Daubert* explained, Rule 702 governs the district court's responsibility to ensure that "any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert*, 509 U.S. at 589, 113 S.Ct. 2786. In *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999), the Court clarified that, whether a witness's area of expertise was technical, scientific, or more generally "experience-based," Rule 702 required the district court to fulfill the "gatekeeping" function of "mak[ing] certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." [11]

*Daubert* enumerated a list of factors that, while not constituting a "definitive checklist or test," a district court might consider in evaluating whether a proffered expert opinion has the required indicia of scientific reliability: whether a theory or technique had been and could be tested, whether it had been subjected to peer review, what its error rate was, and whether scientific standards existed to govern the theory or technique's application or operation. *See Daubert*, 509 U.S. at 593–94, 113 S.Ct. 2786. In addition to setting forth these criteria for testing an expert's methodology, the Supreme Court has also stated that reliability within the meaning of Rule 702 requires a sufficiently rigorous analytical connection between that methodology and the expert's conclusions. "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence which is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion proffered." *General Electric Co. v. Joiner*, 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997). Thus, we have previously stated that "when an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 man-

---

**11.** We note that the relevance and reliability inquiries, as well as the question, discussed below, of whether expert testimony will "assist the trier of fact," are separate from the threshold question of whether a witness is "qualified as an expert by knowledge, skill, experience, training, or education" to render his or her opinions. Fed.R.Evid. 702. The initial question of whether a witness is qualified to be an "expert" is important, among other reasons, because an "expert" witness is permitted substantially more leeway than "lay" witnesses in testifying as to opinions that are not "rationally based on [his or her] perception," *United States v. Garcia*, 291 F.3d 127, 139 & n. 8 (2d Cir.2002). *See, e.g.,*

Fed.R.Evid. 703 (permitting experts to base their opinions on any facts or data "of a type reasonably relied upon by experts in the particular field"); Fed.R.Evid. 705 (permitting experts to "testify in terms of an opinion or inference" without first laying the factual foundation for such opinion or inference). In the instant case, although the admissibility of a number of Dawson's opinions is a highly controverted matter, there is no substantial dispute concerning his expert qualifications as a forensic pathologist. The issue of whether he was at all qualified as an expert on human perception or cognition is quite another matter. *See infra* footnote 13.

date the exclusion of that unreliable opinion testimony." *Amorgianos*, 303 F.3d at 266.

Even after determining that a witness is "qualified as an expert" to testify as to a particular matter, Fed.R.Evid. 702, and that the opinion is based upon reliable data and methodology, Rule 702 requires the district court to make a third inquiry: whether the expert's testimony (as to a particular matter) will "assist the trier of fact." We have consistently held, in that respect, that expert testimony that "usurp[s] either the role of the trial judge in instructing the jury as to the applicable law or the role of the jury in applying that law to the facts before it," *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991), by definition does not "aid the jury in making a decision"; rather, it "undertakes to tell the jury what result to reach," and thus "attempts to substitute the expert's judgment for the jury's," *United States v. Duncan*, 42 F.3d 97, 101 (2d Cir.1994).

In addition to the requirements of Rule 702, expert testimony is subject to Rule 403, and "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." Fed. R.Evid. 403. Indeed, the Supreme Court, echoed by members of our own court, has noted the uniquely important role that Rule 403 has to play in a district court's scrutiny of expert testimony, given the unique weight such evidence may have in a jury's deliberations. *See, e.g., Daubert*, 509 U.S. at 595, 113 S.Ct. 2786 (" 'Expert evidence can be both powerful and quite

misleading because of the difficulty in evaluating it. Because of this risk, the judge in weighing possible prejudice against probative force under Rule 403 of the present rules exercises more control over experts than over lay witnesses.' " (quoting Jack B. Weinstein, *Rule 702 of the Federal Rules of Evidence Is Sound; It Should Not Be Amended*, 138 F.R.D. 631, 632 (1991))); *United States v. Young*, 745 F.2d 733, 766 (2d Cir.1984) (Newman, *J.*, concurring) (noting that "the very breadth of the discretion accorded trial judges in admitting [the expert opinion of a detective testifying as to the criminal nature of a defendant's activities] under Rules 702 and 403 should cause them to give the matter more, rather than less, scrutiny. A trial judge should not routinely admit opinions of the sort at issue here and should weigh carefully the risk of prejudice.").

 We turn, then, to the question of whether Dawson's statements that, in essence, he believed Muirhead and McCarthy to have been truthful in their account of the seconds preceding Muirhead's shooting, as well as Dawson's explanation for the discrepancy between the uncontroverted facts and Muirhead and McCarthy's description of what they saw, were properly admitted.[12]

**c) Dawson's Testimony Concerning the Officers' Credibility**

 It is a well-recognized principle of our trial system that "determining the weight and credibility of [a witness's] testimony . . . . belongs to the jury, who are presumed to be fitted for it by their natural intelligence and their practical knowledge of men and the ways of men . . . ."

**12.** We reject, at the outset, the defense's contention that Nimely's Rule 702 and *Daubert* arguments are unpreserved for appeal. The motion *in limine* clearly raised the issues both of Dawson's qualification to testify to matters concerning Muirhead's and McCarthy's powers of perception, and of the scientific reliabil-

ity of the testimony itself. Additionally, in oral argument on the motion, Nimely expressly relied on *Daubert* in support of his position. There is no basis to the defense's assertion that any *Daubert* admissibility arguments have been waived.

*Aetna Life Ins. Co. v. Ward,* 140 U.S. 76, 88, 11 S.Ct. 720, 35 L.Ed. 371 (1891); *see also United States v. Scop,* 846 F.2d 135, 142 (2d Cir.1988) ("The credibility of witnesses is exclusively for the determination by the jury, and *witnesses may not opine as to the credibility of the testimony of other witnesses at the trial.*" (internal citation omitted and emphasis added)). Thus, this court, echoed by our sister circuits, has consistently held that expert opinions that constitute evaluations of witness credibility, even when such evaluations are rooted in scientific or technical expertise, are inadmissible under Rule 702. *See, e.g., United States v. Lumpkin,* 192 F.3d 280, 289 (2d Cir.1999); *Scop,* 846 F.2d at 142–43; *see also, e.g., United States v. Charley,* 189 F.3d 1251, 1267 (10th Cir.1999); *Westcott. v. Crinklaw,* 68 F.3d 1073, 1076–77 (8th Cir.1995).

Viewed in this light, and against the backdrop of the legal principles governing the admissibility of expert testimony more broadly, we do not believe that Dawson's testimony presents a close case. His direct testimony stated that he "rejected" the possibility that Muirhead and McCarthy had lied, and explained various reasons why police officers have no incentive to give false statements in excessive force cases. On cross-examination Dawson reiterated his conclusion that the police officers were "telling the truth as they perceived it." Even assuming that Dawson, based upon his experience or expertise, was qualified to render an opinion as to the tendencies of police officers to lie or to tell the truth in investigations of the sort at issue here (an assumption of which we are highly dubious), his statements essentially instructed the jury as to an ultimate determination that was exclusively within its province, namely, the credibility of Muirhead and McCarthy. Such testimony does not "assist the trier of fact," Fed. R.Evid. 702, but rather "undertakes to tell the jury what result to reach," and "attempts to substitute the expert's judgment for the jury's," *Duncan,* 42 F.3d at 101. The trial judge erred, in the face of Nimely's strenuous objections, in not striking Dawson's statements.

■ We also believe that the credibility assessments to which Dawson was allowed to testify should have been excluded by the trial court under Rule 403. We have, in other factual contexts, disapproved of the practice of expert witnesses basing their conclusions on the in-court testimony of fact witnesses, out of concern that such expert testimony may improperly bolster the account given by the fact witnesses. *See, e.g., United States v. Dukagjini,* 326 F.3d 45, 53 (2d Cir.2003); *United States v. Cruz,* 981 F.2d 659, 663 (2d Cir.1992). Dawson's testimony went at least one step further, in that it commented directly, under the guise of expert opinion, on the credibility of trial testimony from crucial fact witnesses. Indeed, Dawson was permitted not only to state his belief that the officers were not lying, but also to give to the jury a series of rationales for that belief.

It is beyond question that issues of credibility, and, in particular, the question of whether Muirhead and McCarthy, on the one hand, or Nimely and Collier, on the other, were the more believable witnesses, lay at the heart of this trial. Moreover, the other medical evidence and eyewitness testimony presented at trial called substantially into question the truthfulness of Muirhead and McCarthy's version of events, thus placing the officers' credibility very much at issue. Under such circumstances, we think it was an abuse of the district court's substantial discretion in such matters to determine that Dawson's vouching for Muirhead's and McCarthy's veracity—even were it otherwise admissible—was not prejudicial, confusing, and misleading to the jury within the meaning of Rule 403.

#### d) Dawson's Misperception Hypothesis

■ We also find that the district court failed to exercise its Rule 702 gatekeeping function in allowing Dawson to expound his misperception hypothesis at all. According to Dawson's own direct testimony, he developed the misperception hypothesis as a means of reconciling the uncontroverted medical evidence—that Nimely was shot in the back—with the contrary deposition testimony from Muirhead and McCarthy that Dawson had decided *had to be true*. Indeed, as Dawson conceded on cross-examination, the medical *data* that he analyzed were susceptible of numerous interpretations, including that Muirhead shot Nimely in the back as Nimely was attempting to get up from the ground in order to continue running. Dawson's misperception hypothesis, however, was "elevated ... from possibility to probability" based on "what the officer said and whether [Dawson] assessed that it was likely that they were lying about what they said."

■ Dawson's personal view of the officers' credibility is simply not a sufficiently reliable ground on which to base the conclusion that Muirhead and McCarthy experienced an optical illusion. That such a "methodology" could not even begin to satisfy any of *Daubert*'s criteria for assessing the scientific reliability of an opinion, *see Daubert*, 509 U.S. at 593–94, 113 S.Ct. 2786, only scratches the surface of its shortcomings.[13] Dawson's analytical move from Muirhead and McCarthy's version of events to the misperception hypothesis, was, by his own testimony, driven by the need to find a way of explaining the admitted facts in light of his own instinct that the officers were not lying. Such a leap is the essence of unverifiable subjectivity, amounting to the sort of *ipse dixit* connection between methodology and conclusion that the district court has the duty to exclude under Rule 702. *Cf. Amorgianos*, 303 F.3d at 265–66; *Scop*, 846 F.2d at 142.[14]

#### e) Harmlessness and Rule 59 Analysis

■ Of course, our holding that the district court abused its discretion in allowing Dawson to testify both as to Muirhead's and McCarthy's credibility, and as to the misperception hypothesis, does not, without more, resolve the inquiry with respect to Nimely's new trial motion. Such errors are reversible only if they rendered the jury's verdict contrary to the interests of "substantial justice." Fed.R.Civ.P. 61. To order a new trial we must "find that the introduction of inadmissible evidence was a clear abuse of discretion *and* was so clearly prejudicial to the outcome of the trial that we are convinced that the jury has reached a seriously erroneous result or that the verdict is a miscarriage of jus-

---

13. In the first place, there is no indication whatever that Dawson qualified as an expert on human perception or cognitive function—the subject areas implicated by his misperception hypothesis. Since, even if he was qualified in such fields, his testimony was inadequate for the reasons given in the text, we need not explore this matter further. But it is worth emphasizing that, because a witness qualifies as an expert with respect to certain matters or areas of knowledge, it by no means follows that he or she is qualified to express expert opinions as to other fields. *See United States v. Roldan–Zapata*, 916 F.2d 795, 805 (2d Cir.1990).

14. We note as well that Dawson's opinion concerning Muirhead and McCarthy's experience of an optical illusion was equally inappropriate as lay opinion testimony. Dawson, who was not present at the scene of the shooting, and never interviewed or conducted examinations of Muirhead or McCarthy, had no "personal knowledge" of what Muirhead and McCarthy might have perceived. *See* Fed.R.Evid. 602.

tice." *Luciano v. Olsten Corp.*, 110 F.3d 210, 217 (2d Cir.1997) (internal quotations omitted and emphasis added).

Nevertheless, as we have previously stated, we are " 'especially loath to regard any error as harmless in a close case, since in such a case even the smallest error may have been enough to tilt the balance.' " *Hester v. BIC Corp.* 225 F.3d 178, 185 (2d Cir.2000) (quoting *United States v. Colombo*, 909 F.2d 711, 714 (2d Cir.1990)). Here, we are faced not simply with a *close* case—although, indeed, our review of the trial record shows that the evidence was highly contested and that the jury could readily have come out the opposite way—but, more importantly, a case in which witness credibility was the central issue. Dawson's misperception hypothesis was the primary vehicle through which the defense sought to convince the jury of what otherwise seemed a factual impossibility: that Muirhead and McCarthy truthfully testified that Nimely was shot in the chest, notwithstanding the uncontested medical evidence that Nimely was shot in the back. The prejudice that flowed to Nimely from the erroneous admission of this testimony was magnified when Dawson was permitted to offer "expert" conclusions regarding the tendency of police officers in general, and Muirhead and McCarthy in particular, not to lie in excessive force investigations. Because there is a distinct possibility that,

absent the errors—perhaps individually, and certainly cumulatively—the jury would not have reached the verdict that it did, the prejudice caused by them rendered the verdict "a miscarriage of justice," *Munafo*, 381 F.3d at 105 (internal quotation marks omitted). Therefore, a new trial must be ordered.[15]

### III. Conclusion

For the foregoing reasons, the judgment of the district court is vacated, and the case is remanded for a new trial.

---

**15.** In light of this conclusion, and mindful of the fact that our holding may substantially alter the use, if any, of Dawson's expertise at a retrial, we need not reach two other issues raised by Nimely in connection with Dawson's testimony: (a) that Dawson's testimony that principles of physics enabled Nimely to continue turning after being struck with Muirhead's bullet was beyond the scope of Dawson's expertise; and (b) that the district court erred in not allowing, during cross-examination of Dawson, a physical demonstration of the manner in which Nimely was alleged to have turned toward Muirhead after being shot. Similarly, we need not consider wheth-

er Nimely's other claims of error justify a new trial. These are: 1) that the court abused its discretion in denying his motion for a mistrial, made during the defense's cross-examination of Nimely, and based on the defense's asking Nimely if he had been expelled from high school; 2) that the district court's jury instructions were misleading on the issue of the kind of threat of harm that must be perceived by an officer to justify the use of deadly force under the Fourth Amendment; and 3) that Nimely was entitled to a jury instruction stating that a violation by Muirhead of the NYPD Patrol Guide would be evidence of excessive force.