Sylvia ROBINSON et al., Plaintiffs,

v.

SANCTUARY RECORD GROUPS,
LTD. and Sanctuary Copyrights,
Ltd., Defendants.

No. 03 CV 10235(VM).

United States District Court,
S.D. New York.

March 25, 2008.

Opinion Denying Reconsideration
April 8, 2008.

James P. Cinque, Cinque & Cinque, Oren J. Warshavsky, Troutman Sanders LLP, New York City, for Plaintiffs.

Helene Marian Freeman, Dorsey & Whitney LLP, New York City, for Defendants.

### DECISION AND ORDER

VICTOR MARRERO, District Judge.

Plaintiffs Sylvia Robinson ("S.Robinson"), Sylvia, Inc. ("Sylvia"), and Joseph Robinson, Jr. ("J. Robinson"), individually and as a member of "The Sugar Hill Gang" ("The Sugar Hill Gang"); Henry Jackson ("Jackson") and Michael Wright ("Wright"), professionally known as "The Sugar Hill Gang"; and George Kerr ("Kerr"), Wesaline Music ("Wesaline"), Jonathan Williams ("Williams"), Clifton Chase ("Chase"), and Edward Fletcher ("Fletcher") (collectively, "Plaintiffs") brought this action against defendants Sanctuary Records Group, Ltd. ("Sanctuary Records") and Sanctuary Copyrights, Ltd [1]. ("Sanctuary Copyrights") (collectively, "Defendants" or "Sanctuary"). A default judgment was entered against Defendants on May 28, 2004 by Order of the Honorable Richard Owen (the "Default Judgment"), who then referred the matter to Magistrate Judge Gabriel W. Gorenstein to hear and determine the amount of damages. On March 30, 2006, Magistrate Judge Gorenstein issued a Report and Recommendation (the "Report") concluding that Plaintiffs should not be granted any amount of damages because they had failed to sufficiently establish grounds for any award. After receiving Plaintiffs' Objections to the Report, dated April 10, 2006 ("Pls.' Objections"), Judge Owen held a bench trial (the "Trial") from May 29, 2007 through June 1, 2007 on the sole issue of damages. For the reasons stated below, the Court, having conducted a de novo review, adopts the recommendation of the Report insofar as it is relevant to this Court's conclusions, and supplements Magistrate Judge Gorenstein's analysis in accordance with this Court's own review of the Report, Trial, and factual record. Based on its review, the Court finds that Plaintiffs have not met their burden of proving reasonable damages. Accordingly, Plaintiffs shall be awarded no damages.

### I. BACKGROUND[2]

On December 22, 2003, Plaintiffs, who are artists and record producers, filed the Complaint against "Sanctuary Music," seeking rescission of certain musical recording agreements (the "Agreements")[3],

---

[1] By Order Denying Motion to Vacate Default Judgment and Granting Cross–Motion to Substitute Defendants, dated July 30, 2004 (the "Substitution Order"), defendants Sanctuary Records and Sanctuary Copyrights were substituted for Sanctuary Music. *See infra* Part I.

[2] The following factual summary derives primarily from the Complaint, dated December 22, 2003 (the "Compl."); Default Judgment; Substitution Order; Plaintiffs' Proposed Findings of Fact and Conclusions of Law, dated June 14, 2005; Declaration of James P. Cinque ("Cinque") in Support of Plaintiffs' Damages Application, dated June 14, 2005 ("Cinque Declaration"); Report; Opinion Letter from Cohen to J. Robinson, dated March 16, 2007 (the "Opinion"); Defendants' Pre–Trial

Findings of Fact and Conclusions of Law, dated March 19, 2007; Pls.' Objections; Memorandum of Law in Support of Defendants' Motion in limine, dated April 17, 2007; Defendants' Response to Pls.' Objections, dated April 24, 2006; Memorandum of Points and Authorities in Opposition to Defendants' Motion in Limine, dated May 2, 2007; Trial Transcript, dated May 29, 2007 through June 1, 2007 ("Trial Tr."). Except where specifically referenced, no further citation to these sources will be made.

[3] The Agreements include: an agreement dated May 15, 1970 between S. Robinson and Platinum Record Company, Inc,; an agreement dated January 3, 1982 between S. Robinson and Sugar Hill, Records Ltd. ("Sugar Hill Records"); an agreement dated in or

and incidental damages flowing from exploitation of Plaintiffs' musical recordings or, in the alternative, an order directing "Sanctuary to account and pay [P]laintiffs all royalties due to them pursuant to the terms of the Agreements." (Compl.¶ 40.) Because Sanctuary Music failed to file an Answer, on May 28, 2004, Judge Owen entered the Default Judgment ordering Sanctuary Music to "pay [P]laintiffs all monies received by [Defendants] in connection with [Defendants] exploitation of [P]laintiffs' recordings since May 31, 1995," and referring the matter to Magistrate Judge Gorenstein "to hear and determine the amount of money received by [Defendants] from the exploitation of Plaintiffs' recordings since May 31, 1995, plus interest." (Default Judgment 3.) Defendants unsuccessfully moved to vacate the Default Judgment on the ground that they were not properly served, and Plaintiffs successfully cross-moved to amend the Complaint nunc pro tunc, substituting defendants Sanctuary Records and Sanctuary Copyrights in place of Sanctuary Music.

Magistrate Judge Gorenstein presided over an extensive damages inquest. For five months in the latter half of 2004, the parties engaged in acrimonious discovery disputes which came to a head in a motion to compel argued before Magistrate Judge Gorenstein on November 29, 2004. Defendants took the position that they were not obligated to participate in discovery because the Default Judgment rendered Plaintiffs ineligible to take discovery. At oral argument, however, Defendants changed their position and agreed to participate in discovery. By Order dated December 2, 2004, Magistrate Judge Gorenstein directed that "Plaintiffs Proposed Findings of Fact should specifically tie the proposed damages figure(s) to the legal claim(s) on which liability has been established; should demonstrate how [Plaintiffs have] arrived at the proposed damages figure(s); and should be supported by one or more affidavits." (Scheduling Order For Damages Inquest, dated December 2, 2004.) After further discovery disputes and extensions to the briefing schedule, the parties filed their briefs. Following review of the parties' submissions, Magistrate Judge Gorenstein directed additional briefing on certain issues. Although it is unclear from the record, Plaintiffs sought either $343,807,995.30 or $234,681,227.30 in damages. Defendants argued that Plaintiffs were not entitled to damages. Neither party requested a hearing.

On March 30, 2006, Magistrate Judge Gorenstein issued the Report concluding that Plaintiffs should not be awarded any damages for two reasons. First, in considering the calculation of damages, Plaintiffs concede that they sought recovery of damages only for rescission, and they did not seek damages for breach of contract. Second, Plaintiffs were owed no damages incidental to rescission because Plaintiffs did not establish which recordings were the

about 1970 between S. Robinson and All Platinum Record Company ("All Platinum"); an agreement dated in or about 1980 between S. Robinson and Sylvia; an agreement dated July 25, 1981 between J. Robinson and Sugar Hill Records; an agreement dated in or about 1980 between J. Robinson and Sugar Hill Records; an agreement dated August 25, 1979 between Jackson, Wright, Guy O'Brien ("O'Brien") and Sylvia; an agreement dated in or about 1980 between Jackson, Wright, O'Brien and Sugar Hill Records; an agreement dated May 6, 1971 between Kerr and All Platinum; an agreement dated in or about 1994 or 1995 between Wesaline and Sugar Hill Records; an agreement dated in or about 1975 between Williams and All Platinum; an agreement dated April 7, 1976 between Williams and All Platinum; an agreement dated in or about 1980 between Chase and Sugar Hill Records; and an agreement dated October 11, 1981 between Fletcher and Sugar Hill Records.

subject matter of the Agreements, thus making any reasonable calculation of the extent of Defendants' exploitation revenue impossible.

Despite Magistrate Judge Gorenstein's direction to Plaintiffs to "specifically tie" their damages to the legal claims upon which liability was established, the length of the damages inquest, and the volume of submissions, Plaintiffs failed to submit any evidence tying their damages to their legal claims. Plaintiffs did not even submit the majority of the Agreements at issue. Magistrate Judge Gorenstein concluded that Plaintiffs had not met their burden of specifically tying damages to the rescinded Agreements, specifically concluding that "[t]here is no basis on which this Court can make findings of the amount by which Sanctuary was unjustly enriched through its exploitation of the recordings that were the subject matter of the Agreements." (Report 16.)

Plaintiffs filed objections to Magistrate Judge Gorenstein's Report on April 10, 2006, arguing that the Court should make a de novo damages assessment. The Court agreed, and Judge Owen conducted the Trial from May 29, 2007 through June 1, 2007. Prior to the Trial, on April 17, 2007, Defendants made a motion in limine to exclude any evidence offered by Plaintiffs concerning claims or contracts that were not pleaded in the Complaint. Plaintiffs submitted a written response on May 2, 2007.

## II. DISCUSSION

### A. REPORT AND RECOMMENDATION

█ A district court evaluating a magistrate judge's report may adopt those portions to which no "specific, written objection" is made, as long as the factual and legal bases supporting the findings and conclusions set forth in those sections are not clearly erroneous or contrary to law. See Fed.R.Civ.P. 72(b); Thomas v. Arn, 474 U.S. 140, 149, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); Greene v. WCI Holdings Corp., 956 F.Supp. 509, 513 (S.D.N.Y. 1997). A district court is not required to review any portion of a magistrate judge's report that is not the subject of an objection. See Thomas, 474 U.S. at 149, 106 S.Ct. 466. However "the district judge retains the power to engage in sua sponte review of any portion of the magistrate's report and recommendation, regardless of the absence of objections." Cespedes v. Coughlin, 956 F.Supp. 454, 463 (S.D.N.Y. 1997) (citations and quotation marks omitted). "Where a party makes a 'specific written objection ... after being served with a copy of the [magistrate judge's] recommended disposition,' however, the district court is required to make a de novo determination regarding those parts of the report." Cespedes, 956 F.Supp. at 463 (quoting United States v. Raddatz, 447 U.S. 667, 676, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980)). In making its determination, a district judge "may accept, reject or modify the recommended decision, receive further evidence, or return the matter to the magistrate judge with instructions." Fed.R.Civ.P. 72(b); DeLuca v. Lord, 858 F.Supp. 1330, 1345 (S.D.N.Y.1994).

### B. DEFAULT DAMAGES

█ When a default judgment is entered, a plaintiff is required to prove damages with "reasonable certainty," Credit Lyonnais Sec. (USA) v. Alcantara, 183 F.3d 151, 152 (2d Cir.1999), using competent evidence, see Transatlantic Marine Claims Agency, Inc., v. Ace Shipping Corp., 109 F.3d 105; Fustok v. ContiCommodity Servs., Inc., 873 F.2d 38, 40 (2d Cir.1989). When plaintiffs rely on expert testimony and reports, such testimony and reports must have the "required indicia of scientific reliability." Nimely v. City of New York, 414 F.3d 381, 397 (2d Cir.2005)

(*citing Daubert v. Merrell Dow Pharms. Inc.*, 509 U.S. 579, 589, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993)). Here, Plaintiffs' recovery under the Default Judgment is based on the rescission of the rights conveyed in the Agreements. Therefore, Plaintiffs bear the burden of proving the amount of damages owed from Defendants' exploitation of Plaintiffs' recordings that were the subject matter of the Agreements. *See Greyhound Exhibitgroup, Inc. v. E.L.U.L. Realty Corp.*, 973 F.2d 155, 160 (2d Cir.1992) (observing that plaintiff "bore the burden of proving . . . each item of damage it claimed" at the inquest); *Trans World Airlines, Inc. v. Hughes*, 449 F.2d 51, 70 (2d Cir.1971), *rev'd on other grounds*, 409 U.S. 363, 93 S.Ct. 647, 34 L.Ed.2d 577 (1973) (requiring plaintiff to "establish that [its] damages were attributable to" its cause of action for which it received a default judgment). In order to prove their damages, Plaintiffs relied on the testimony and Opinion of their expert and only witness, Gary Cohen ("Cohen"), a royalty auditor.

 When the Court enters a default judgment, it must "accept[ ] as true all of the factual allegations of the complaint," *Au Bon Pain Corp. v. Artect, Inc.*, 653 F.2d 61, 65 (2d Cir.1981), but "the amount of damages are not deemed true." *Credit Lyonnais*, 183 F.3d at 152; *see Cotton v. Slone*, 4 F.3d 176, 181 (2d Cir. 1993) ("[F]actual allegations are taken as true in light of the general default judgment."); *Greyhound*, 973 F.2d at 158 ("While a party's default is deemed to constitute a concession of all well pleaded allegations of liability, it is not considered an admission of damages.") (citations omitted). The Court must "conduct an inquiry in order to ascertain the amount of damages with reasonable certainty." *Credit Lyonnais*, 183 F.3d 151, 152. This inquiry "involves two tasks: determining the proper rule for calculating damages on such a claim, and assessing plaintiff's evidence

supporting the damages to be determined under this rule." *Id.* In calculating damages, the Court "need not agree that the alleged facts constitute a valid cause of action." *Au Bon Pain*, 653 F.2d at 65. Accordingly, the Court will consider to what extent Plaintiffs have demonstrated "with reasonable certainty" that they are legally entitled to damages. *Credit Lyonnais*, 183 F.3d 151, 152. The Court has wide discretion in this regard. *See Sony Corp. v. Elm State Elecs., Inc.*, 800 F.2d 317, 321 (2d Cir.1986). For the reasons set forth below, the Court finds that Plaintiffs have not met their burden of proving damages "with reasonable certainty." *Credit Lyonnais*, 183 F.3d 151, 152.

## C. *EXPERT TESTIMONY*

Rule 702 of the Federal Rules of Evidence ("Rule 702") allows a "witness qualified as an expert by knowledge, skill, experience, training or education" to testify if his "specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." Fed.R.Evid. 702. Courts within the Second Circuit "have liberally construed expert qualification requirements" when determining whether a witness can be considered an expert. *TC Sys. Inc. v. Town of Colonie, New York*, 213 F.Supp.2d 171, 174 (N.D.N.Y.2002); *see also McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1042 (2d Cir.1995) ("The decision to admit expert testimony is left to the broad discretion of the trial judge and will be overturned only when manifestly erroneous."); *United States v. Brown*, 776 F.2d 397, 400 (2d Cir.1985) (qualification requirements of Rule 702 "must be read in light of the liberalizing purpose of the rule"); *Canino v. HRP, Inc.*, 105 F.Supp.2d 21, 27 (N.D.N.Y.2000) (stating that "liberality and flexibility in evaluating qualifications should be the rule").

The Second Circuit has instructed that a trial court, in determining whether a witness is qualified to render an expert opinion, "must first ascertain whether the proffered expert has the educational background or training in a relevant field." *TC Sys.*, 213 F.Supp.2d at 174. Then the court "should further compare the expert's area of expertise with the particular opinion the expert seeks to offer [and permit t]he expert ... to testify only if the expert's particular expertise ... enables the expert to give an opinion that is capable of assisting the trier of fact." *Zwillinger v. Garfield Slope Housing Corp.*, No. 94 Civ. 4009, 1998 WL 623589, at *7 (E.D.N.Y. Aug. 17, 1998) (citations and quotation marks omitted) (alterations in original). Here, Judge Owen did not designate Cohen as an expert. (*See* Trial Tr. 36:24–37:3.) ("THE COURT: Counsel, I don't declare anybody to be an expert or not, but if your questions are within the area for which his testimony has laid a basis for expertise and there is an objection to, I will overrule it.")

Nonetheless, the Court will analyze Cohen's Opinion and testimony under the factors set forth in *Daubert*, 509 U.S. at 589, 113 S.Ct. 2786, to determine whether they have "the required indicia of scientific reliability." *See Nimely*, 414 F.3d at 397 (*citing Daubert* 509 U.S. at 593–94, 113 S.Ct. 2786). To assist courts with the reliability analysis, "*Daubert* enumerated a list of factors that, while not constituting a 'definitive checklist or test,' a district court might consider," including "whether a theory or technique has been and could be tested, whether it had been subjected to peer review, what its error rate was, and whether scientific standards existed to govern the theory or technique's application or operation." *Nimely*, 414 F.3d at 397 (*quoting Daubert* 509 U.S. at 593–94, 113 S.Ct. 2786). "[W]hen an expert opinion is based on data, a methodology, or studies that are simply inadequate to support the conclusions reached, *Daubert* and Rule 702 mandate the exclusion of that unreliable opinion testimony." *Amorgianos v. National R.R. Passenger Corp.*, 303 F.3d 256, 266 (2d Cir.2002) (citation omitted). Under *Daubert* and Rule 702, expert testimony must be both relevant and reliable. *See Daubert*, 509 U.S. at 589, 113 S.Ct. 2786; *see also* Fed.R.Evid. 702. Here, Cohen's Opinion and testimony is relevant to the damages inquest because he was retained for the purpose of determining Plaintiffs' damages. However, for the following reasons, the Court finds that Cohen's testimony and Opinion do not meet the *Daubert* standard of reliability.

1. *Cohen's Opinion and Testimony*

Cohen was retained two months prior to the Trial for the sole purpose of verifying the Cinque Declaration, which was in evidence at the time Magistrate Judge Gorenstein concluded that Plaintiffs' damages evidence was insufficient. In that capacity, Cohen "summarized" and "checked" the summaries and calculation of profits created by Plaintiffs' counsel, Cinque, and created the Opinion based upon the Cinque Declaration. (Trial Tr. 49:7–51:13.) Cohen did not conduct an independent royalty audit, and his review of Sanctuary's voluminous production was limited to the documents that Cinque disclosed to Cohen. (*See id.* 69:2–17; 71:14–18.) For example, Cinque withheld exhibits from Cohen Defendants' expert's declaration, the Declaration of Edward Cook, dated August 23, 2005 ("Cook Declaration"), which included certain royalty statements that would have been relevant to Cohen's calculations. (*See id.* 69:2–17; 72:4–24.)

Despite his limited review, Cohen concluded that there were four categories of sales made by Sanctuary licensees from which Sanctuary purportedly earned income through exploitation of Plaintiffs' re-

cordings: (1) advances received; (2) royalties earned; (3) synchronization and sample licenses; and (4) direct sales. The first two categories cover advances and royalties Sanctuary received from licensing Plaintiffs' recordings to third parties. The third category, synchronization, refers to income received through a specific kind of license in which music is used in conjunction with visual materials, such as in a movie or a television commercial. The last category, direct sales, covers sales by Sanctuary to record stores, which in turn sell to consumers. Cohen concluded that Sanctuary's exploitation totaled £17,368,510, or, converted into dollars, $34,110,017. (*See* Opinion 2; *see generally* Trial Tr. 52:14–68:24.)

Cohen's methodology can be summarized as follows. To define the universe of Plaintiffs' exploited recordings, Cohen relied upon lists created by Plaintiffs ("Plaintiffs' Lists") of recordings that Defendants exploited. (*See* Trial Tr. 173:3–10) ("Q: There are a variety of lists annexed to your report which you referred to as plaintiffs' recordings in your report; correct? A: Yes. Q: Now, you did not create those lists, did you? A: Those were created by the plaintiff. Q: Do you know who in particular created those lists? A: I was told that Joey Robinson created those lists."). Using Plaintiff's Lists, Cohen calculated the amount of advances and sales income Defendants purportedly received from licensing Plaintiffs' recordings—the first two of the four categories of profits—by taking the advances and sales estimates contained in Sanctuary's licensing agreements with third parties. Cohen assumed that these advances and sales estimates were accurate. Next, to calculate Sanctuary's synchronization profits, Cohen assumed that Sanctuary's proceeds equaled the synchronization and sample license proceeds received by Warner Music Group ("WMG"), the licensee of Plaintiffs' recordings in North America. Cohen's assump-

tion was based on the underlying premise that Sanctuary had split the synchronization rights with WMG equally, meaning that synchronization license income for North America constituted 50 percent of worldwide synchronization license income. Thus, if WMG had 50 percent of the worldwide market, Sanctuary had the other 50 percent.

Finally, to calculate Sanctuary's direct sales, which constitute the bulk of the approximately $34 million damages figure Cohen reached, Cohen made the "reasonable assumption that Sanctuary directly sold the same number of units per record as its third party licensees sold." (Opinion 4.) To determine the number of units Sanctuary's third party licensees sold, Cohen relied on sales estimates contained in agreements for recordings licensed by Sanctuary to third party record manufacturers. Cohen identified 124 exploited albums based on documents "supplied by Sanctuary" and, from these 124 albums "determined that the average number of units [sold] embodying Plaintiffs' Recordings is 46,708." (*Id.; see, e.g., id.* at 3–4. ("Based on documents supplied by Sanctuary, I identified one hundred and twenty-four different products embodying one or more performances by Plaintiffs as producers or recording artists.").) Cohen reached the average of 46,708 by adding up all of sales estimates contained in the third-party licenses (3,596,483), and dividing that number by the total number of licenses (77). Cohen then multiplied the average number of units by the average price of an album for the year in which it was released, and, after discounting for pro-ration—such as where Plaintiffs' recordings may have been combined with other recordings—concluded that Sanctuary received £15,947,722 in direct sales. The individual calculations are contained on two pages of a schedule attached to Cohen's Opinion. (*See* Schedule of Poten-

tial Gross Revenues–Direct Sales, attached as Schedule 3–1 to the Opinion.)

In addition, Plaintiffs' calculation of damages assumes that the Default Judgment entitles them to receive the total amount of Sanctuary's revenues from exploiting Plaintiffs' recordings, and, therefore, Cohen's calculations are based on Sanctuary's total revenues. (*See* Reply Declaration of Cinque in Support of Plaintiffs' Damages Application, dated Sept. 6, 2005, 28.) However, the calculation fails to consider Sanctuary's expenses and costs associated with the exploitation of Plaintiffs' recordings that should have been deducted from Sanctuary's total revenue to determine the amount of any damages. The record contains information regarding Sanctuary's expenses that Plaintiffs could have used to calculate the amount of Sanctuary's costs, including expenditures based on manufacturing, packaging, and shipping of recordings to third party distributors; various agreements containing settlement and new recording agreements between Sanctuary and artists included in Plaintiffs' lists; and royalty payments. (*See* Cook Declaration ¶¶ 51–64.)

### 2. *Cohen's Reliability*

For the reasons that follow the Court finds that Cohen's Opinion and testimony are insufficiently reliable to support a reasonable damages calculation. Cohen did not conduct an independent audit and reviewed only a small portion of Defendants' production. Crucially, Cohen's methodology is founded on hearsay supplied by Plaintiffs' counsel—hardly a source of first-hand, independent expert knowledge—incomplete comparisons, and dubious assumptions.

Neither Cohen nor Plaintiffs submitted any evidence identifying Plaintiffs' ownership interest in the exploited recordings. In addition, as noted above, Cohen testified that he made little or no determination as to the universe of exploited recordings. Cohen asserts that to determine which recordings Defendants exploited, he compared Plaintiffs' Lists against the part of Sanctuary's production that he reviewed. However, neither Cohen nor Plaintiffs made any effort to connect Plaintiffs' Lists to the Agreements even though Magistrate Judge Gorenstein concluded that "while [P]aintiffs provide . . . a listing of albums that have been exploited by Sanctuary, nothing connects these albums to the rescinded Agreements." (Report 15.) During the Trial, Plaintiffs introduced most of the Agreements into evidence. However, Plaintiffs did not offer any evidence identifying their ownership interests or connecting the Agreements to Plaintiffs' Lists, the documents on which all damages are premised. Without any connection between Plaintiffs' Lists and the Agreements, Cohen's entire analysis is either indefensibly premised on hearsay not "of a type reasonably relied upon by experts in the particular field," Fed. R.Evid. 703, or premised on an incomplete—or possibly irrelevant—comparison to what Sanctuary produced. As Magistrate Judge Gorenstein explained, and this Court concurs, Plaintiffs cannot recover any damages without specifically and reliably connecting the Agreements to their lists of exploited albums. Plaintiffs never made this connection. Thus, Plaintiffs Lists are not reliable.

Nevertheless, even if Plaintiffs' Lists were reliable and Plaintiffs' have full ownership interest in the exploited recordings, there is no basis upon which this Court can reasonably conclude that Cohen's methodology is reliable. Cohen's estimate is built upon one flawed assumption after another, and despite Plaintiffs' complaints of discovery abuse, the record reflects that Defendants produced sufficient documentation to permit Plaintiffs to test the reliability of Cohen's assumptions. However, Cohen

and Cinque never tested their calculations as commended by *Daubert,* instead relying exclusively on their many faulty assumptions. *See Amorgianos,* 303 F.3d at 267 ("[T]he Daubert 'requirement that the expert testify to scientific knowledge—conclusions supported by good grounds for each step in the analysis—means that any step that renders the analysis unreliable under the Daubert factors renders the expert's testimony inadmissible.' ") (*quoting In re Paoli R.R. Yard PCB Litig.,* 35 F.3d 717, 745 (3d Cir.1994); *citing Heller v. Shaw Indus. Inc.,* 167 F.3d 146, 155 (3d Cir.1999) ("[T]he reliability analysis applies to all aspects of an expert's testimony: the methodology, the facts underlying the expert's opinion, the link between the facts and the conclusion, et alia.")).

For example, Cohen and Cinque never verified the advances and sales projections contained in third-party license agreements with third parties from whom they could have sought discovery. More importantly, Cohen and Cinque assumed that Sanctuary had the same number of direct sales as projected in third-party license agreements without any attempt to verify those sales estimates, even though they had royalty statements reflecting actual, not projected, sales. There is thus no sufficient, reliable basis for the Court to evaluate these assumptions other than to recognize that they are many and should have been verified.

Moreover, Cohen testified that he was unaware of any other expert in the field who had used this methodology before, and that his estimate was not made according to Generally Accepted Accounting Principles. Cohen and Cinque repeatedly conceded at the Trial that their damage estimates were not based on verified calculations or facts. (*See, e.g.,* Opinion at 5; Trial Tr. 530 (stating, in summation: "And what we have to support Plaintiffs' position is [Cohen's Opinion] ... Cohen says

that I didn't have the backup documents that ordinarily I would have had, and he said that based upon that, I had to do the best I could. And what did he do? He made certain estimates").) Plaintiffs' explanation that they did not have sufficient documentation to make accurate accounting does not by some unknown alchemy convert unreliable evidence into reliable evidence. *See Seneca Ins. Co. v. Wilcock,* No. 01 Civ. 7620, 2007 WL 415141, at *10–11 (S.D.N.Y. Feb. 5, 2007) (rejecting expert testimony because "it rests on a plainly inadequate methodology—that is, an accounting without backup—and makes concededly false assumptions as to facts that are central to the accuracy or inaccuracy of the calculations") (citations omitted).

Finally, Cohen admitted that his calculations contained material errors such as double-counting. (*See, e.g.,* Trial Tr. 88:3–91:6) (Helene M. Freeman, attorney for Defendants,: "There is certainly a material number of errors that you failed to catch. Cohen: Right.") As previously noted, Cohen's analysis divided Sanctuary's profits into four categories. However, in making those separate calculations, Cohen relied on some of the same sales estimates, thus posing the danger of counting the same sales estimates twice, once in one category and again in another. Cohen and Cinque testified that there were numerous instances of double-counting. (*See, e.g.,* Trial Tr. 102:2–23; 104:9–105:22; 110:3–20; 113:23–114:14; *see also id.* at 133:10–22 (Cinque stating that "we did the best we could ... maybe $50,000 or something ... might be duplicative. But other than that, the report is solid"); *see id.* 147:15–24 ("THE COURT: Counsel, look, I'm going to blow the whistle on this.... You have established that there are a number of places here which [Cohen] has said because he's having to make estimates he made a mistake here or a mistake there

or a duplication or that kind of thing, that's all been established now.").)

Plaintiffs counter that the unreliability of their damage calculation should be overlooked because Sanctuary's production was insufficient. This argument was rejected by Magistrate Judge Gorenstein and it is rejected by the Court. The record reflects that Sanctuary's production was voluminous and that their document retention policy was reasonable. Plaintiffs complain that Sanctuary did not produce records of total revenue by album, even though the testimony established that Sanctuary has had no reason to maintain such records. By contrast, Sanctuary did maintain records of and produced royalty statements owed under various contracts. However, Plaintiffs chose not to rely on those royalty statements; instead, they premised their damages estimate on assumptions and the sales projections in the third-party licensing agreements. Plaintiffs' bore the burden of proving their damages with "reasonable certainty," *Credit Lyonnais*, 183 F.3d at 152, but they failed to do so. For the foregoing reasons, Plaintiffs have failed to present any reliable evidence upon which the Court can calculate damages. Accordingly, the Court finds that Plaintiffs should not be awarded any damages pursuant to the Default Judgment.

### III. ORDER

For the reasons stated above, it is hereby

**ORDERED** that Clerk of Court is directed to enter judgment dismissing the complaint of plaintiffs Sylvia Robinson, Sylvia, Inc., and Joseph Robinson, Jr., individually and as a member of "The Sugar Hill Gang;" Henry Jackson and Michael Wright, professionally known as "The Sugar Hill Gang;" and George Kerr, Wesaline Music, Jonathan Williams, Clifton Chase, and Edward Fletcher in this action.

The Clerk of Court is directed to withdraw any pending motions and close this case.

**SO ORDERED.**

### *DECISION AND ORDER*

By Decision and Order dated March 24, 2008 (the "Decision and Order"), the Court determined that plaintiffs Sylvia Robinson, Sylvia, Inc., and Joseph Robinson, Jr., individually and as a member of "The Sugar Hill Gang"; Henry Jackson and Michael Wright, professionally known as "The Sugar Hill Gang"; and George Kerr, Wesaline Music, Jonathan Williams, Clifton Chase, and Edward Fletcher (collectively, "Plaintiffs") should not be awarded any damages pursuant to the default judgment entered May 28, 2004 by Order of the Honorable Richard Owen (the "Default Judgment"). In addition, the Court directed the Clerk of Court to enter judgment dismissing the complaint of Plaintiffs in this action, withdraw any pending motions and to close this case.

On April 3, 2008, Plaintiffs filed a Notice of Motion for reargument or reconsideration of the portion of the Decision and Order which dismissed the complaint, or, in the alternative, Plaintiffs moved pursuant to Federal Rules of Civil Procedure 60(a) ("Rule 60(a)") for an order to amend or correct the Decision and Order deleting the portion that directs the Clerk of Court to enter judgment dismissing the complaint. For the reasons set forth below, Plaintiffs' motion is DENIED.

### I. *BACKGROUND*

On December 22, 2003, Plaintiffs filed a complaint (the "Complaint") against defendants[1] Sanctuary Records Group, Ltd.

---

1. By Order Denying Motion to Vacate Default Judgment and Granting Cross–Motion to Substitute Defendants, dated July 30, 2004 (Docket No. 10), defendants Sanctuary Records and Sanctuary Copyrights were substituted for Sanctuary Music.

("Sanctuary Records") and Sanctuary Copyrights, Ltd. ("Sanctuary Copyrights") (collectively, "Sanctuary") seeking rescission of certain musical recording agreements (the "Agreements"),[2] and incidental damages flowing from exploitation of Plaintiffs' musical recordings or, in the alternative, an order directing "Sanctuary to account and pay [P]laintiffs all royalties due to them pursuant to the terms of the Agreements." (Compl.¶ 40.) Because Sanctuary Music failed to file an Answer, on May 28, 2004, Judge Owen entered the Default Judgment rescinding the Agreements as of May 31, 1995, ordering Sanctuary to pay Plaintiffs all monies received by Sanctuary in connection with Sanctuary's exploitation of Plaintiffs' recordings since May 31, 1995, and referring the matter to Magistrate Judge Gorenstein "to hear and determine the amount of money received by [Sanctuary] from the exploitation of Plaintiffs' recordings since May 31, 1995, plus interest." (Default Judgment 3.)

Magistrate Judge Gorenstein presided over an extensive damages inquest and, on March 30, 2006, issued a Report and Recommendation (the "Report") concluding that Plaintiffs should not be awarded any damages because Plaintiffs had not met their burden of specifically tying any of the damages they alleged to the Agreements.

On April 10, 2006, Plaintiffs filed objections to the Report, arguing that the Court should make a de novo damages assessment. The Court agreed, and Judge Owen held a bench trial from May 29, 2007 through June 1, 2007 on the sole issue of damages. On March 24, 2008, the Court issued its Decision and Order finding that Plaintiffs should not be awarded any damages, and directed the Clerk of Court to enter judgment dismissing the Complaint, withdraw any pending motions and close the case.

## II. DISCUSSION

### A. STANDARD OF REVIEW

Rule 60(a) provides that a court "may correct a clerical mistake or a mistake arising from oversight or omission whenever one is found in a judgment, order, or other part of the record ... on motion or on its own, with or without notice." Fed.R.Civ.P. 60(a). "A motion under Rule 60(a) is available only to correct a judgment for the purpose of reflecting accurately a decision that the court actually made." *Hodge ex rel. Skiff v. Hodge*, 269 F.3d 155, 158 (2d Cir.2001) (citations and quotation marks omitted). "To be correctable under Rule 60(a), the [alleged error] must fail to reflect the actual intention of the court." *Paddington Partners v. Bouchard*, 34 F.3d 1132, 1140 (2d Cir.1994) (citations omitted).

**2.** The Agreements include: an agreement dated May 15, 1970 between S. Robinson and Platinum Record Company, Inc,; an agreement dated January 3, 1982 between S. Robinson and Sugar Hill, Records Ltd. ("Sugar Hill Records"); an agreement dated in or about 1970 between S. Robinson and All Platinum Record Company ("All Platinum"); an agreement dated in or about 1980 between S. Robinson and Sylvia; an agreement dated July 25, 1981 between J. Robinson and Sugar Hill Records; an agreement dated in or about 1980 between J. Robinson and Sugar Hill Records; an agreement dated August 25, 1979 between Jackson, Wright, Guy O'Brien and Sylvia; an agreement dated in or about 1980 between Jackson, Wright, O'Brien and Sugar Hill Records; an agreement dated May 6, 1971 between Kerr and All Platinum; an agreement dated in or about 1994 or 1995 between Wesaline and Sugar Hill Records; an agreement dated in or about 1975 between Williams and All Platinum; an agreement dated April 7, 1976 between Williams and All Platinum; an agreement dated in or about 1980 between Chase and Sugar Hill Records; and an agreement dated October 11, 1981 between Fletcher and Sugar Hill Records.

## B. *APPLICATION*

Plaintiffs' allege that the Court, in dismissing the complaint against Sanctuary, overlooked the Default Judgment whereby Judge Owen rescinded the Agreements. The Plaintiffs are concerned that because the Decision and Order directed the Clerk of Court to dismiss the Complaint that the Default Judgment no longer has effect. The Court disagrees.

■ The Decision and Order was limited to the determination "of the amount of money received by Sanctuary from the exploitation of Plaintiffs' recordings since May 31, 1995, plus interest." (Default Judgment 3.). The Decision and Order did not affect the entry of the Default Judgment rescinding the Agreements and, therefore, the Default Judgment remains in full force and effect. The Court's dismissal of the Complaint was intended to apply to the extent that any other issues remained open after the entry of the Default Judgment. Therefore, there is no clerical mistake or oversight in the Decision and Order. Accordingly, Plaintiffs' motion for reconsideration or reargument is denied.

### III. *ORDER*

For the foregoing reasons, it is hereby

**ORDERED** that the motion (Docket No. 82) for reargument or reconsideration of the portion of the Decision and Order dated March 24, 2008 (Docket No. 80) dismissing the complaint is DENIED.

**SO ORDERED.**