**John A. ZACCARO, Plaintiff,**

v.

**Hasu P. SHAH, Kiran P. Patel, Affordable Hospitality Associates, L.P., Affordable Hospitality, Inc., Hersha Hospitality Trust, Hersha Enterprises, Ltd., Nish Capital, Inc., 3344 Associates, L.P., John Does 1–10, Mary Does 1–10, and Doe Corporations 1–10, Defendants.**

No. 08 Civ. 3138(PKC).

United States District Court,
S.D. New York.

Sept. 29, 2010.

512

Monika S. Pundalik, Eli John Rogers, Joanne M. Bonacci, Dreifuss Bonacci & Parker, LLP, Florham Park, NJ, for Plaintiff.

Edward Anthony Fleck, Fleck, Fleck & Fleck, Garden City, NY, Anthony L. Byler, Evan A. Blaker, Byler & Blaker, LLC, Philadelphia, PA, for Defendants.

## MEMORANDUM AND ORDER

P. KEVIN CASTEL, District Judge.

Plaintiff John Zaccaro was a limited partner in Affordable Hospitality Associates, L.P. ("AHA"), a Pennsylvania limited partnership that was organized to own and operate a hotel in Philadelphia (the "Hotel"). In November 2005, Zaccaro sold his 16.5% interest in AHA to defendant Nish Capital, Inc. ("Nish") for $203,000. Within two weeks, Nish sold this interest at no profit to a company owned by defendant Hasu Shah. Three months later, a real estate investment trust called Hersha Hospitality Trust (the "REIT") purchased 80% of AHA for a net amount of approximately $6.9 million-paying approximately seven times more for Zaccaro's share of AHA than he received a few months before.

Defendant Hasu Shah was chairman of the REIT and defendant Kiran Patel was one of the REIT's directors. Unbeknownst to plaintiff, but known to Shah and other defendants, at the time Zaccaro's sale, the REIT had executed a letter of intent to purchase that 80% of AHA. In addition to his other roles, at the time of the sale by limited partner Zaccaro, defendant Shah was president of the corporation that was AHA's sole general partner. The REIT purchased the remaining 20% a year-and-a-half later for a net amount of approximately $4.1 million.

Zaccaro has sued his former limited partners and AHA's general partner, as

well as AHA, Nish, the REIT and others, alleging a variety of claims, including fraud, breach of contract and breach of fiduciary duty. Zaccaro has moved for summary judgment against defendant Shah on his fraud and breach of fiduciary duty claims. Various defendants have moved for summary judgment on certain of plaintiff's claims. In addition, the defendants have moved to preclude plaintiff's expert witness from testifying at trial. For the reasons stated below, plaintiff's motion for summary judgment against defendant Shah is denied. Defendants, other than Affordable Hospitality, Inc. ("AHI"), are granted summary judgment on plaintiff's demand for an accounting. In all other respects, defendants' motion for summary judgment is denied. The defendants' motion to preclude plaintiff's expert from testifying at trial is granted.

BACKGROUND

I. *Factual History*

The following facts are taken from the parties' Local Civil Rule 56.1 Statements and Counter–Statements, and deposition testimony and exhibits filed by the parties. The facts are undisputed, unless otherwise indicated.

Zaccaro holds a real estate broker license and has worked in the real estate industry for much of his life. (Defs. 56.1 Cntr.-Stmt. ¶¶ 28–32.) In late–1998, he and defendant Hersha Enterprises, Ltd. ("Enterprises") entered into a non-binding letter of intent to form a joint venture to build and operate the Hotel. (Defs. 56.1 Stmt. ¶¶ 1–2.) They planned to locate the Hotel at a corner of 13th and Race Streets in Philadelphia, Pennsylvania. (*Id.* ¶ 1.) In March 1999, plaintiff entered into an Agreement of Limited Partnership (the "Partnership Agreement") with defendants Hasu Shah and AHI and non-party Stephen Guzzardi. (*Id.* ¶ 2; Bonacci Sept. 14 Aff. Exh. 2 at 1.) The Partnership Agree-ment created a new entity, AHA, which is a limited partnership and a defendant in this action. (Defs. 56.1 Stmt. ¶ 2.)

According to the Partnership Agreement, AHA's purpose was to "acquire certain real property at 210–212 North 13th Street and 1301–1309 Race Streets in Philadelphia, Pennsylvania" and "to develop and construct improvements thereon, including [the Hotel], and to own, operate and manage the Real Property." (Bonacci Sept. 14 Aff. Exh. 2 at 3.)

At the time of AHA's formation, and at all relevant times afterwards, AHI was AHA's sole general partner. (Defs. 56.1 Stmt. ¶ 5; Bonacci Sept. 14 Aff. Exh. 2 at 1, 24.) Shah was AHI's president and Shah and Zaccaro were both limited partners in AHA. (Pl. 56.1 Stmt. ¶ 7; Bonacci Sept. 14 Aff. Exh. 2 at 1, 24.) AHI owned 1% of AHA, Shah owned 49.5% and Zaccaro owned 24.75%. (Bonacci Sept. 14 Aff. Exh. 2 at 24.) The remainder was owned by Guzzardi. (Bonacci Sept. 14 Aff. Exh. 2 at 24.)

At some point during the first half of 2001, Shah transferred his entire interest in AHA to defendant 3344 Associates, L.P. ("3344") for nominal consideration. (Def. 56.1 Stmt. ¶ 15; Byler Sept. 14 Aff. Exh. 12 ¶ 3; Byler Sept. 28 Aff. Exh. 11 at 261:21–24.) Shah claims that he notified Zaccaro of this fact at a partnership meeting. (Byler Sept. 28 Aff. Exh. 11 at 261:25–262:6.) Also in 2001, Zaccaro sold 8.25% of his interest in AHA, leaving him with 16.5%. (Def. 56.1 Stmt. ¶ 4.)

In addition to his other roles, defendant Shah is the chairman of the REIT. (Pl. 56.1 Stmt. ¶ 10.) As chairman, Shah's responsibilities included oversight of the REIT's acquisitions. (*Id.*)

On May 27, 2004, the REIT's acquisition committee (the "Acquisition Committee") held a meeting. (Bonacci Sept. 14 Aff.

Exh. 7 at HHT 2 016–18.) Shah attended. (*Id.* at HHT 2016.) A document was prepared for that meeting, which the parties have referred to as an "acquisition dashboard." (Byler Sept. 28 Aff. Exh. 12 at 280:17–281:24.) The acquisition dashboard listed the Hotel as one of five "2005 Anticipated Acquisitions." (Bonacci Sept. 14 Aff. Exh. 6 at HHT 2691.) At the May 24 meeting, one of the Acquisition Committee members inquired whether the Hotel could "be purchased by the REIT via a joint venture structure if an outright acquisition [was] not feasible." (Bonacci Sept. 14 Aff. Exh. 7 at HHT 2016.) Ashish Parikh, a member of the REIT's management, responded that "Hersha Affiliates were working with the debt lenders to refinance this property and that a potential joint venture transaction or outright purchase may be possible upon refinancing [the Hotel.]" (*Id.*)

By 2005, the relationship between plaintiff and certain of the defendants had deteriorated. In or around March 2005, defendant Patel offered to purchase Zaccaro's interest in AHA for $1.00. (Bonacci Sept. 28 Aff. Exh. G ¶ 23.) Zaccaro rejected the offer. At approximately the same time, Shah told Zaccaro that the REIT was not interested in purchasing the Hotel. (Pl. 56.1 Stmt. ¶ 12.)

However, in August 2005, the REIT "looked at" proceeding with a transaction involving the Hotel. (*Id.* ¶ 16.) On September 7, 2005, the REIT's Acquisition Committee met again. (*Id.* ¶ 13.) The minutes of that meeting reflect that defendants Shah and Patel were present. (Bonacci Sept. 14 Aff. Exh. 13 at HHT 2019.) According to the minutes, Shah's son, nonparty Neil Shah, "indicated that discussions have been initiated with the owners of the [Hotel] . . . to engage in preferred joint venture transactions and that management is seeking the Committee's ap-

proval to move forward with these deals." (*Id.* at HHT 2020.) The Acquisition Committee unanimously approved authorization for "management to proceed with the joint venture acquisition of [the Hotel] . . . as presented to the Committee." (Pl. 56.1 Stmt. ¶ 14.) No one told plaintiff about the Committee's authorization. (*Id.* ¶ 15.)

At approximately the same time, a "deal summary" was prepared. (Bonacci Sept. 14 Aff. Exh. 19 at 302:24–303:4.) The deal summary indicated that the REIT was "[c]onsidering an 80/20 Joint Venture" between the REIT and AHA. (Bonacci Sept. 14 Aff. Exh. 17 at HHT 2003.) In connection with the REIT's consideration of AHA, defendant Shah authorized the Hotel's management company to provide the REIT with AHA's historical operating information. (Pl. 56.1 Stmt. ¶ 18.)

On October 25, 2005, Shah requested that Sovereign Bank transfer $1 million to the account of a third party as a deposit for the acquisition of the Hotel. (*Id.* ¶ 19.) Plaintiff was not advised of the deposit. (*Id.* ¶ 20.) On October 26, 2005, Parikh, on behalf of the REIT, and defendant Patel, on behalf of AHA, executed a letter of intent for the REIT to purchase 80% of AHA. (*Id.* ¶ 21; Bonacci Sept. 14 Aff. Exh. 27 at PATEL 2 002.) Zaccaro was not advised that this letter of intent existed or that it had been executed. (Pl. 56.1 Stmt. ¶ 22.)

On November 3, 2005, pursuant to an assignment agreement (the "Zaccaro–Nish Assignment Agreement"), Zaccaro sold his remaining 16.5% interest in AHA to defendant Nish for $203,000. (Def. 56.1 Stmt. ¶¶ 4, 6; Byler Sept. 14 Aff. Exh. 8.) Defendant Patel was the president of Nish and its sole "member." (Bonacci Sept. 14 Aff. Exh. 31 ¶ 1; Bonacci Sept. 28 Aff. Exh. C at 22:3–5.) Patel was also a member of the REIT's board of directors with Shah. (Bonacci Sept. 28 Aff. Exh. G ¶ 11.)

Less than two weeks later, on November 14, 2005, Nish sold the 16.5% interest in AHA to Hersha Capital, Inc. ("HCI") for no profit. (Bonacci Sept. 14 Aff. Exh. 31 ¶ 3.) Shah and Patel were owners of HCI and Shah was its president. (Bonacci Sept. 14 Aff. Exh. 35 at 109:24–110:5.)

On February 15, 2006, the REIT purchased 80% of AHA, based on a 100% acquisition price of $27 million. (Bonacci Sept. 28 Aff. Exh. H at AHA 2 586.)[1] Net of total debt, the REIT paid $6,920,340 for that 80% interest. (*Id.*) The REIT purchased the remaining 20% of AHA in or around October 2007, based on a 100% acquisition price of $41.78 million. (Bonacci Sept. 28 Aff. Exh. N at 2929.) Net of existing mortgages, the REIT paid $4,162,656 for that 20% interest (including $66,000 in contingent consideration). (*Id.*)

The ownership structure of AHA at a time just prior to the Zaccaro–Nish transaction is disputed. Plaintiff and defendants agree that Zaccaro owned 16.5% of AHA. (Defs. 56.1 Stmt. ¶ 4.) They also agree that AHI, the general partner, owned 1%. (*Id.* ¶ 5.) According to defendants, the remaining 82.5% was owned by one or more of the defendants. (*Id.*) Zaccaro claims HCI owned 33% of AHA and that 3344 owned the remaining 49.5% of AHA. (Pl. 56.1 Cntr.-Stmt. ¶ 5; Bonacci Sept. 28 Aff. Exh. L.)

Finally, unbeknownst to Zaccaro, on or around June 3, 1998–prior to the events largely at issue here—defendants Shah and Patel, and certain other individuals who are not defendants, signed an option agreement with the REIT (the "Option Agreement"). (Byler Sept. 28 Aff. Exh. 10 at HHT 2 669–80.) The Option Agreement provided Hersha Hospitality Limited Partnership (of which the REIT was a general partner), with a right to purchase the Hotel pursuant to a price formula contained in the agreement. (Pl. 56.1 Stmt. ¶ 27; Byler Sept. 28 Aff. Exh. 10.)

## II. *Procedural History*

Zaccaro filed his original Complaint in the Supreme Court of the State of New York, County of New York. Defendants removed the case, invoking the Court's subject matter jurisdiction by reason of diversity of citizenship. (D.E. 1.) In a March 31, 2008 Order, the Court noted that the allegations contained in the defendants' notice of removal were insufficient to establish complete diversity of citizenship and ordered the defendants to file an amended notice of removal. (D.E. 8.) On April 14, 2008, defendants filed their amended notice of removal, alleging the citizenship of each named defendant. (D.E. No. 22.)

Zaccaro filed an Amended Complaint on May 19, 2008. (D.E. 31.) He filed a Second Amended Complaint on July 24, 2009. (D.E. 53.) Discovery has closed and the parties have filed the instant motions, which are fully submitted.

I also note that the by letter dated September 10, 2009, Zaccaro's counsel agreed to dismiss to following: (1) all claims against Enterprises, (2) breach of contract claims against AHA, the REIT and Nish, (3) unjust enrichment claims against AHA, and Nish, and (4) his request for an accounting from the REIT and Nish. (Byler Sept. 14 Aff. Exh. 1.) Defendants have not stated an objection to the dismissals. The foregoing claims and parties are dismissed. Rule 41(a)(2), Fed. R.Civ.P.

---

1. Although entities controlled by the REIT were the actual purchasers, for simplicity's sake I will refer to the REIT as the purchaser.

## DISCUSSION

### I. *Jurisdiction*

As stated above, the defendants have invoked this Court's diversity jurisdiction. Several of the defendants are partnerships and at least one of them is a trust. In addition, Zaccaro has named as defendants John and Mary Does 1 through 10 and Doe corporations 1 through 10. (Compl. ¶¶ 19–20.) The defendants' amended notice of removal contains adequate factual allegations to allow the Court to determine that plaintiff is a citizen of New York and all the defendants are citizens of Pennsylvania and/or Maryland. (Amended Notice of Removal ¶¶ 5–13.) There is no indication of the citizenship of the Doe defendants. "Although the Second Circuit has not ruled on this question, district courts in the Circuit have held that the mere inclusion of John Doe defendants does not destroy complete diversity until it is later found that one or more of the unknown defendants is domiciled such that there is not complete diversity." *Doe v. Ciolli,* 611 F.Supp.2d 216, 220 (D.Conn.2009) (citations and quotation marks omitted). The parties have not pointed to anything in the record indicating that the citizenship of any Doe defendant destroys complete diversity. The Court has subject matter jurisdiction of this action.

### II. *Defendants' Motion to Exclude the Expert Testimony of John O'Donnell Is Granted*

#### A. *Applicable Law*

Rule 702, Fed.R.Evid., provides that a qualified expert may offer an opinion if his or her "specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue," and if "(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." While Rule 702 "embodies a liberal standard of admissibility for expert opinions," the Rule "[does] not represent an abdication of the screening function traditionally played by trial judges." *Nimely v. City of New York,* 414 F.3d 381, 395–96 (2d Cir. 2005).

In ruling on the admissibility of expert testimony, a district court must first determine whether a proffered expert is qualified. *See id.* at 396 n. 11. If the proffered expert is qualified, the district court must then assess whether his or her proposed testimony satisfies the other criteria set forth in Rule 702, *i.e.* that it is reliable. The reliability inquiry is guided by the factors enumerated by the Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). These factors include "whether a theory or technique had been or could be tested, whether it had been subjected to peer review, what its error rate was, and whether scientific standards existed to govern the theory or technique's application or operation." *Nimely,* 414 F.3d at 396. They "do *not* constitute a 'definitive checklist or test.' " *Kumho Tire Co. v. Carmichael,* 526 U.S. 137, 150, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999) (quoting *Daubert,* 509 U.S. at 593, 113 S.Ct. 2786). The key issue is whether the expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Id.* at 152, 119 S.Ct. 1167. A court's "inquiry must be tied to the facts of a particular case." *Id.* (internal quotations and citations omitted).

"[E]xpert testimony should be excluded if it is speculative or conjectural, or if it is based on assumptions that are so unrealistic and contradictory as to suggest bad faith or to be in essence an apples and

oranges comparison ....." *Boucher v. U.S. Suzuki Motor Corp.,* 73 F.3d 18, 21 (2d Cir.1996) (per curiam) (citations and quotation marks omitted). "[O]ther contentions," however, "that the assumptions are unfounded go to the weight, not the admissibility, of the testimony." *Id.* A district court should determine "whether the expert acted reasonably in making assumptions of fact upon which he would base his testimony," but "[a]dmission of expert testimony based on speculative assumptions is an abuse of discretion." *Id.* at 21–22. "[N]othing in either *Daubert* or the Federal Rules of Evidence requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert." *Kumho Tire Co.,* 526 U.S. at 157, 119 S.Ct. 1167.

■ Finally, a district court must determine whether the proposed testimony will "assist the trier of fact." *Nimely,* 414 F.3d at 397. This requirement relates primarily to relevance. *Daubert,* 509 U.S. at 591, 113 S.Ct. 2786. The Second Circuit "requires the exclusion of testimony which states a legal conclusion" because such testimony does not aid the trier of fact. *United States v. Duncan,* 42 F.3d 97, 101 (2d Cir.1994). In addition, expert testimony that usurps "the role of the jury in applying th[e] law to the facts before it, by definition does not aid the jury in making a decision; rather, it undertakes to tell the jury what result to reach, and thus attempts to substitute the expert's judgment for the jury's." *Nimely,* 414 F.3d at 397 (quotation marks and citations omitted; alteration in original).

In determining whether expert testimony is helpful to the trier of fact, courts should be mindful that expert testimony is subject not just to Rule 702, but also to Rule 403. Expert testimony "may be excluded if its probative value is substantially outweighed by the danger of unfair preju-

dice, confusion of the issues, or misleading the jury." Rule 403, Fed.R.Evid.; *see also Nimely,* 414 F.3d at 397 (quoting same).

**B.** *The O'Donnell Report and Proposed Testimony*

The defendants do not challenge O'Donnell's qualifications. They do argue that O'Donnell's opinions are unreliable and are mere legal conclusions. O'Donnell's opinions are contained in a 40–page report (excluding exhibits) (the "O'Donnell Report"). Much of the O'Donnell Report is a recitation of facts. However, it does contain some analysis in the form of arithmetical calculations of Zaccaro's damages.

Pages 28 through 34 of the O'Donnell Report contain O'Donnell's damages analysis. In his analysis, O'Donnell assumes that the 2006 transaction in which the REIT purchased 80% of AHA would have gone forward on the same terms that it did, with the exception that Zaccaro would not have sold any of his interest in AHA. (O'Donnell Rpt. at 28–30.) O'Donnell then assumes that the 2007 transaction in which the REIT purchased the remaining 20% of AHA—for a higher price per percentage of ownership than it did in the 2006 transaction-would have gone forward on the same terms that it did, except that Zaccaro would have sold his entire 16.5% ownership interest to the REIT. (*Id.* at 30–32.) O'Donnell then calculates that Zaccaro would have received approximately $3.4 million for his interest. (*Id.* at 32.) Subtracting that value from the amount he actually received in 2005, O'Donnell calculates Zaccaro's damages at the time of the sale as $3,197,720 (before interest). This calculation, contained on the cover letter to the O'Donnell report, does not account for the fact that Zaccaro was paid the $203,000 in 2005, but would not have sold his AHA interest until two years later.

■ This analysis relies almost exclusively on speculation as to future events. The only basis O'Donnell gives for assuming that Zaccaro would not have sold his 16.5% interest in AHA in 2006, but would have sold his interest in AHA in 2007, is that "Mr. Zaccaro testified that his goal was for the Hotel to be a long term investment," which, according to O'Donnell, is consistent with section 8.03 of the Partnership Agreement. (*Id.* at 32.) O'Donnell does not explain why this testimony allows him to assume that Zaccaro would not have sold in 2006 because he was interested in holding his ownership share as a long-term investment, but then to further assume that Zaccaro would have sold his ownership share in 2007 despite the fact that he wanted to hold his ownership share as a long-term investment. It is just as plausible that Zaccaro may never have sold. O'Donnell's citation to section 8.03 of the Partnership Agreement is a *non sequitur*, as that section simply allows AHA's limited partners to sell their interest in AHA, but says nothing about plaintiff's investment goals. (Bonacci Sept. 14 Aff. Exh. 2 at 15.) In short, O'Donnell's assumption is not reasonable.

O'Donnell does not opine as to what the Hotel is worth now. Therefore, there is no evidence that even if Zaccaro had retained his AHA ownership stake and never sold, it would be worth more now than the $203,000 he received for it.

Finally, O'Donnell did not undertake any independent method of valuing plaintiff's ownership stake in AHA. O'Donnell's testimony regarding plaintiff's damages is "speculative and conjectural," and it is excluded.

The majority of the remainder of the O'Donnell Report consists of a recitation of facts concerning AHA. For example, much of the report details alleged improprieties in the books and records of AHA and instances of self-dealing between related entities. O'Donnell does not link any of these alleged improprieties or conflicted transactions to his calculation of Zaccaro's damages. Zaccaro asserts claims for fraud and breach of fiduciary duty, but not arising from the events O'Donnell describes. This testimony would have minimal probative value which would be substantially outweighed by the potential to confuse the jury and for unfair prejudice and is excluded. Rule 403.

Finally, some of the O'Donnell Report's conclusions improperly usurp the role of the Court and the jury. For example, O'Donnell's statements that "Mr. Shah and Mr. Patel fraudulently induced Mr. Zaccaro to sell his 16.5% interest," that the defendants "breached the terms of the Partnership Agreement," and that "[b]y intentionally concealing their negotiations and agreement to sell to the REIT, the defendants breached their fiduciary duty to" plaintiff, are improper legal conclusions. (O'Donnell Rpt. at 39–40.) O'Donnell's statement that the "defendants intentionally failed to inform Mr. Zaccaro of the REIT's pending acquisition of [AHA]," undertakes to tell the jury which conclusion to reach. (*Id.* at 39.)

Based on the foregoing, the O'Donnell Report and testimony based upon that report will be excluded at trial.

III. *Exclusion of O'Donnell's Testimony Does Not Mandate Summary Judgment in the Defendants' Favor*

The defendants argue that since O'Donnell cannot testify about the damages plaintiff incurred, the defendants are entitled to summary judgment on any claim for which damages is an element. Plaintiff, however, has come forward with other evidence from which a reasonable jury could conclude that he sustained damages

by selling his 16.5% interest in AHA for $203,000. Plaintiff has produced evidence that approximately four months after he sold his interest in AHA, the owners of AHA sold 80% of the partnership for a net amount of $6,920,340. (Bonacci Sept. 28 Aff. Exh. H at AHA 2586.) Based on that sale price, a rational jury could conclude that at the time plaintiff sold his 16.5% interest for $203,000, it was actually worth more than that amount. Therefore, precluding O'Donnell from testifying does not mandate summary judgment in the defendants' favor.

## IV. *Summary Judgment Standard*

Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Rule 56(c)(2), Fed.R.Civ.P. It is the initial burden of a movant on a summary judgment motion to come forward with evidence on each material element of his claim or defense, demonstrating that he is entitled to relief. A fact is material if it "might affect the outcome of the suit under the governing law . . . ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The evidence on each material element must be sufficient to entitle the movant to relief in its favor as a matter of law. *Vt. Teddy Bear Co., Inc. v. 1–800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir.2004).

When the moving party has met this initial burden and has asserted facts to demonstrate that the non-moving party's claim cannot be sustained, the opposing party must "set out specific facts showing a genuine issue for trial," and cannot rest "merely on allegations or denials" of the facts asserted by the movant. Fed. R.Civ.P. 56(e)(2). In raising a triable issue

of fact, the nonmovant carries only a "limited burden of production," but nevertheless "must 'demonstrate more than some metaphysical doubt as to the material facts,' and come forward with 'specific facts showing that there is a genuine issue for trial.'" *Powell v. Nat'l Bd. of Med. Exam'rs*, 364 F.3d 79, 84 (2d Cir.2004) (quoting *Aslanidis v. U.S. Lines, Inc.*, 7 F.3d 1067, 1072 (2d Cir.1993)).

An issue of fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. The Court must "view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in its favor, and may grant summary judgment only when no reasonable trier of fact could find in favor of the nonmoving party." *Allen v. Coughlin*, 64 F.3d 77, 79 (2d Cir.1995) (internal quotations and citations omitted). In reviewing a motion for summary judgment, the Court must scrutinize the record, and grant or deny summary judgment as the record warrants. Fed.R.Civ.P. 56(c)(2). When cross-motions for summary judgment are filed, "each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against that party whose motion is under consideration." *Morales v. Quintel Entm't Inc.*, 249 F.3d 115, 121 (2d Cir. 2001). In the absence of any disputed material fact, summary judgment is appropriate.

## V. *Plaintiff's Motion for Summary Judgment on His Fraud Claim Against Shah Is Denied*

### A. *Applicable Law*

Plaintiff has asserted a fraud claim against Shah, but plaintiff has not identified under which state's law he brings this claim. Neither Shah nor plaintiff has argued that there is a material

difference between the laws of New York and Pennsylvania—the two jurisdictions' laws the parties cite. Indeed, plaintiff argues that the Court need not undertake a conflict of law analysis because the laws governing fraud claims in Pennsylvania and New York are consistent. (Pl. Sum. Judg. Memo. at 9.) If there is no conflict between the laws of the forum state—here New York—and any other jurisdiction whose law is invoked, then the Court should apply the law of the forum. *Excess Ins. Co. v. Factory Mut. Ins. Co.*, 2 A.D.3d 150, 151, 769 N.Y.S.2d 487 (1st Dep't 2003), *aff'd*, 3 N.Y.3d 577, 789 N.Y.S.2d 461, 822 N.E.2d 768 (2004).

In any event, plaintiff's fraud claim arises under New York law. In analyzing tort claims, New York courts apply "a so-called interest analysis" under which "the law of the jurisdiction having the greatest interest in the litigation applies." *AroChem Int'l Inc. v. Buirkle*, 968 F.2d 266, 270 (2d Cir.1992). "In deciding which state has the prevailing interest, we look only to those facts or contacts that relate to the purpose of the particular laws in conflict." *Id.* "Under this formulation, the significant contacts are, almost exclusively, the parties' domiciles and the locus of the tort." *Id.* (quoting *Schultz v. Boy Scouts of Am., Inc.*, 65 N.Y.2d 189, 197, 491 N.Y.S.2d 90, 480 N.E.2d 679 (1985)). Plaintiff is a New York domiciliary. In addition, it appears that plaintiff executed the Zaccaro–Nish Assignment Agreement-transferring his interest in AHA-in New York. (Bonacci Sept. 14. Aff. Exh. 32 at 5.) Therefore, plaintiff's fraud claim is governed by New York law.

**B.** *Summary Judgment Is Denied as to the Affirmative Statement That the REIT Was Not Interested in Purchasing the Hotel*

Under New York law, to succeed on a claim of fraudulent misrepresentation, a plaintiff must show "that the defendant made a material misrepresentation of fact; that the misrepresentation was made intentionally in order to defraud or mislead the plaintiff; that the plaintiff reasonably relied on the misrepresentation; and that the plaintiff suffered damage as a result of its reliance on the defendant's misrepresentation." *P.T. Bank Central Asia v. ABN AMRO Bank N.V.*, 301 A.D.2d 373, 376, 754 N.Y.S.2d 245 (1st Dep't 2003). Zaccaro's fraudulent misrepresentation claim arises from Shah's statement, made sometime in "the beginning of 2005," that the REIT was not interested in purchasing the Hotel. (Pl. 56.1 Stmt. ¶ 12.) According to evidence presented by Zaccaro, on May 27, 2004, Shah attended a meeting of the REIT's Acquisition Committee during which the committee discussed purchasing the Hotel. (Bonacci Sept. 14 Aff. Exh. 7 at HHT 2016.) A document prepared for that meeting listed the Hotel as one of the REIT's "2005 Anticipated Acquisitions" for a price of $27 million, the same price the REIT used to value AHA when the REIT purchased its 80% interest in AHA. (Bonacci Sept. 14 Aff. Exh. 6 at HHT 2691; Bonacci Sept. 28 Aff. Exh. H at AHA 2586.)

Shah argues that Zaccaro could not have reasonably relied upon this statement because he never subsequently asked Shah or any other defendant whether they were trying to find a buyer for the Hotel. However, Shah points to nothing in the record that would signal to plaintiff that he should have asked Shah or someone else to confirm Shah's representation. Shah also argues that Zaccaro's reliance was unreasonable as a matter of law because Zaccaro did not review AHA's books and records in 2005 when he had the chance. However, Shah has not identified anything within those books and records that would have

put a reasonable person in Zaccaro's situation on notice that Shah's prior statement was no longer true. For example, Shah has not come forward with evidence showing that AHA's books and records would have disclosed the existence of the ongoing negotiations with the REIT to purchase a portion of AHA.

Zaccaro has produced some circumstantial evidence indicating that Shah made the statement in early 2005 with the intent or purpose of inducing plaintiff to rely on it to his detriment. Zaccaro sold his ownership stake in AHA to Nish, which was controlled by defendant Patel. Almost immediately, Nish sold its interest in AHA to HCI for no profit. (Bonacci Sept. 14 Aff. Exh. 31 ¶ 3.) Shah was an owner and president of HCI. (Bonacci Sept. 14 Aff. Exh. 35 at 109:24–110:5.) Therefore, Shah benefitted from Zaccaro's sale. Although this is some evidence of Shah's state of mind, it is not sufficient to allow the Court to conclude that Shah acted with the intent to defraud Zaccaro. Therefore, Zaccaro is not entitled to summary judgment on this claim.

■ In any event, Shah has come forward with evidence sufficient to create a genuine dispute regarding whether the statement was false at the time it was made. According to an affidavit of Ashish Parikh, CFO of the REIT, in "early 2005 the REIT Acquisition Committee decided against pursuing an acquisition of the [Hotel] ... based on the financial data that was then available relating to the Hampton Inn's 2004 Calendar year results." (Parikh Sept. 28 Aff. ¶ 3.) This decision, according to Parikh, occurred sometime after February 2005. (*Id.* ¶¶ 2–3.) In addition, Parikh testified that the REIT began reexamining the potential transaction again during the summer of 2005. (Bonacci Sept. 14 Aff Exh. 16 at 159:13–160:5.) A reasonable inference from this evidence is that Shah's statement was true at the time he made it, and the REIT only decided to pursue a merger after Shah's representation to Zaccaro.

Zaccaro calls the Parikh affidavit a "sham affidavit" and asks the Court to ignore it. It is a settled rule in this Circuit that "a party may not, in order to defeat a summary judgment motion, create a material issue of fact by submitting an affidavit disputing his own prior sworn testimony." *Trans–Orient Marine Corp. v. Star Trading & Marine. Inc.*, 925 F.2d 566, 572 (2d Cir.1991).[2] In his deposition, Parikh was asked about a franchise license agreement contained in the closing documents for the 2006 transaction, bearing the date "March 2005" in its footer. (Bonacci Sept. 14 Aff. Exh. 10 at 287:23–290:7.) Parikh testified that it was usually a "60– to 90–day process to get a franchise license agreement fully completed and ironed out. So my estimate would be sometime in January of 2005 that [the licensor] would have been contacted [by the REIT] on a contemplated transaction." (*Id.* at 290:2–7.) This somewhat contradicts Parikh's statement that the REIT decided against pursuing the acquisition of AHA in "early 2005." But, the two statements—particularly with the imprecision in reference to timing—are not so irreconcilable that the Court can disregard the affidavit at this stage. There is a hotly disputed issue of fact between plaintiff's version and Parikh's affidavit that is best left for the trier of fact.

Drawing all reasonable inferences in Shah's favor as the non-moving party, the

---

**2.** Although Parikh is not a defendant, he is the CFO of defendant REIT and a member of defendant 3344.

Court cannot conclude that Zaccaro is entitled to judgment on his fraud claim arising from Shah's affirmative representation in early 2005 that the REIT was not interested in purchasing the Hotel.

C. *Summary Judgment Is Denied as to the Failure to Disclose the REIT's Negotiations to Purchase the Hotel Shortly Before the Sale*

 A claim for fraudulent concealment requires the traditional elements of a fraud—scienter, reasonable reliance and damages—and further requires that "the defendant had a duty to disclose material information and that it failed to do so." *P.T. Bank Central Asia,* 301 A.D.2d at 376, 754 N.Y.S.2d 245. Zaccaro alleges that Shah should have disclosed certain information to him. Most notably, Zaccaro argues that Shah should have disclosed that the REIT Acquisition Committee authorized the acquisition of AHA at its September 7, 2005 meeting, and that in late-October 2005, the REIT signed a letter of intent to purchase the Hotel and paid a $1 million deposit. This was shortly before Zaccaro's sale of his interest in AHA to Nish; Shah, individually, was a co-signatory to the Zaccaro–Nish Assignment Agreement. Eleven days later Nish resold to HO, of which Shah was president and owner.

 New York law imposes a duty of disclosure "where one party [to a transaction] possesses superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge," or in a situation "where the party has made a partial or ambiguous statement, on the theory that once a party has undertaken to mention a relevant fact to the other party it cannot give only half of the truth." *Brass v.*

*American Film Techs., Inc.,* 987 F.2d 142, 150 (2d Cir.1993) (quoting *Aaron Ferer & Sons Ltd. v. Chase Manhattan Bank, N.A.,* 731 F.2d 112, 123 (2d Cir.1984)).

Shah knew that the REIT, of which, he, Shah, was Chairman, had authorized a purchase of 80% of AHA for a net amount of approximately $6.9 million. Shah authorized a $1 million deposit on the purchase. Less than two weeks later Shah co-signed the Zaccaro–Nish Assignment Agreement effectuating the sale of Zaccaro's interest in AHA to Nish. Shah, through HCI, an entity of which he was an owner, repurchased Zaccaro's interest from Nish at the exact cost Nish paid Zaccaro. Just three months later Shah sold that interest to the REIT for approximately seven times what HCI paid for it.

 Under New York law, Shah, possessed of superior knowledge not readily available to Zaccaro as to the REIT's interest in purchasing AHA, had a duty to disclose that knowledge to Zaccaro to correct his mistaken belief that the REIT was not interested in purchasing AHA, particularly in view of Shah's prior statement that the REIT was not interest in purchasing the Hotel.

However, to establish an actionable fraud by omission under New York law, Shah must have acted with an intent to defraud. As discussed above, Zaccaro has not come forward with sufficient evidence to allow the Court to make that determination on a motion for summary judgment.[3]

VI. *The Cross–Motions on Plaintiff's Aiding and Abetting a Breach of Fiduciary Duty Are Denied*

Plaintiff has moved for summary judgment on his breach of fiduciary duty claim

---

**3.** Plaintiff also argues that Shah had a duty to disclose this information because he was plaintiff's partner. As discussed below, this is

not the case, because it is undisputed that Shah sold his interest in AHA to 3344 in 2001, well before the sale at issue here.

against Shah. The REIT and Nish have moved for summary judgment in their favor on plaintiff's breach of fiduciary duty claim.

### A. The REIT and NISH Are Not Entitled to Summary Judgment on Plaintiff's Aiding and Abetting a Breach of Fiduciary Duty Claim

Nish and the REIT originally moved for summary judgment on the ground that they were not, and never had been, fiduciaries of Zaccaro. In response, Zaccaro argued that, although not denominated as such, his Second Amended Complaint set forth a claim against these two defendants for aiding and abetting a breach of fiduciary duty. In their reply, Nish and the REIT argued that the Second Amended Complaint did not provide them with notice of this aiding and abetting theory sufficient to satisfy Rule 8(a), Fed.R.Civ.P.

■ The REIT and Nish's argument misapprehends the federal pleading standards. "[F]ederal pleading is by statement of claim, not by legal theory." *Flickinger v. Harold C. Brown & Co., Inc.*, 947 F.2d 595, 600 (2d Cir.1991). Plaintiff's Second Amended Complaint alleges, among other things, that the REIT and Nish "knowingly and willingly participated in the breach of fiduciary duties owed by their co-defendants." (Second Amended Complaint ¶ 101.) It also alleges that defendant Shah "reaped significant financial rewards for himself," the REIT and Nish "by breaching his fiduciary duties to his Partner." (*Id.* ¶ 99.) The Second Amended Complaint also alleges that these two defendants, along with others, "conspired" to "persuade Plaintiff into selling his shares, thereby providing [the REIT with] the opportunity to acquire 80% of the Partnership's interest." (*Id.* ¶ 98.) Therefore, plaintiff provided Nish and the REIT with adequate notice of his claim and he is not barred from proceeding on

an aiding and abetting theory. *Cf. Gins v. Mauser Plumbing Supply Co.*, 148 F.2d 974, 976 (2d Cir.1945) ("particular legal theories of counsel yield to the court's duty to grant the relief to which the prevailing party is entitled, whether demanded or not"). As this is the sole ground on which Nish and the REIT move for summary judgment on plaintiff's claim for aiding and abetting a breach of fiduciary duty, their motion is denied.

### B. Plaintiff Is Not Entitled to Summary Judgment Against Shah for Aiding and Abetting a Breach of Fiduciary Duty

■ As with his fraud claim, Zaccaro has not identified the applicable state law governing his claim. Under both New York and Pennsylvania law, one of the elements required to prove a breach of fiduciary duty is the existence of a fiduciary relationship. *Kurtzman v. Bergstol,* 40 A.D.3d 588, 590, 835 N.Y.S.2d 644 (2d Dep't 2007) ("In order to establish a breach of fiduciary duty, a plaintiff must prove the existence of a fiduciary relationship, misconduct by the defendant, and damages that were directly caused by the defendant's misconduct."); *Airgas, Inc. v. Cravath, Swaine & Moore LLP,* Civ. A. No. 10–612, 2010 WL 3046586, at *4 (E.D.Pa. Aug. 3, 2010) ("To establish a breach of fiduciary duty under Pennsylvania law, [plaintiff] must first prove that a fiduciary relationship existed between the parties.").

Even assuming, *arguendo,* that under the law of either state limited partners owe each other fiduciary duties, it is undisputed that defendant Shah transferred his entire interest in AHA in 2001, prior to any of the actions that form the basis of plaintiff's breach of fiduciary duty claim. (Def. 56.1 Stmt. ¶ 15.) Plaintiff has not

provided any authority for imposing a fiduciary duty on a former limited partner.

Plaintiff argues that this transfer violated the terms of the Partnership Agreement, and therefore Shah should still be considered a partner in AHA. Plaintiff cites no New York law in support of this argument and cites only one case applying Pennsylvania law, *Smith v. Acorn Management Company,* No.2004–C–2402, —— Pa. ——, —— A.3d ——, 2007 WL 2985337 (Pa.Ct.Com.Pl. Jan. 2, 2007). *Smith* is distinguishable. In *Smith,* the Pennsylvania Court of Common Pleas refused to declare that Smith was no longer a partner, in part because he had not followed the steps called for in the partnership agreement for withdrawing from that partnership. *Id.* at ——, at *42. The plaintiff in *Smith* claimed to have conveyed his interest in the partnership to a third party by way of a "stipulation." *Id.* at ——, at *41. The court concluded, however, that this stipulation did not actually purport to convey plaintiff's interest in the partnership: "The literal language of the stipulation merely conveys his interest in assets (but not liabilities of) the … partnership." *Id.* at ——, at *41–42. In this case, Shah has come forward with evidence that he transferred his entire interest in AHA, not just a partial interest. On this record, I cannot conclude that Shah was a partner in AHA and owed a fiduciary duty to Zaccaro as a partner.

Plaintiff's alternative argument is that Shah is liable for breach of fiduciary duty because he was an officer of AHA's general partner, AHI. This is essentially an aiding and abetting theory. As stated above, the Second Amended Complaint gives Shah notice of plaintiff's claim, even if it did not identify the specific legal theory under which liability may be imposed.

▮ Pennsylvania's highest court has not explicitly recognized a claim for aiding and abetting a breach of fiduciary duty. It has, however, implicitly recognized its viability. *Official Committee of Unsecured Creditors of Allegheny Health Education and Research Foundation v. PriceWaterhouseCoopers,* 989 A.2d 313, 327 n. 14 (Pa. 2010) ("Under present Pennsylvania law as established by the Commonwealth Court as the highest appellate court which has reached the issue, aiding and abetting a breach of fiduciary duty is a recognized cause of action.") (citing *Koken v. Steinberg,* 825 A.2d 723, 732 (Pa.Commw.2003)). The Court of Appeals for the Third Circuit has recognized a claim for aiding and abetting a breach of fiduciary duty under Pennsylvania law. *Huber v. Taylor,* 469 F.3d 67, 79 (3d Cir.2006). District courts in two of Pennsylvania's three districts have held that aiding and abetting a breach of fiduciary duty is a viable cause of action under Pennsylvania law. *E.g., Laufen Int'l, Inc. v. Larry J. Lint Floor & Wall Covering, Inc.,* No. 10 Civ. 199, 2010 WL 1714032, at *5 (W.D.Pa. Apr. 27, 2010); *Matlack Leasing, LLC v. Morison Cogen, LLP,* Civ. A. No. 09–1570, 2010 WL 114883, at *11 (E.D.Pa. Jan. 13, 2010). Based on my review of these authorities, and the reasoning set forth therein, I predict that a New York court would decide that a Pennsylvania court would recognize this cause of action. *See Booking v. General Star Mgmt. Co.,* 254 F.3d 414, 421 (2d Cir.2001) (citing *Rogers v. Grimaldi,* 875 F.2d 994, 1002 n. 10 (2d Cir.1989) (discussing the " 'two-step process' whereby a federal diversity court applying the law of a state other than the one in which it sits must predict (1) what the courts of the state in which it sits would decide as to (2) what the courts of another state would decide")).

▮ There is no conflict between the laws of Pennsylvania and New York. Under Pennsylvania law, a plaintiff may be

found liable for aiding and abetting a breach of fiduciary duty if (1) there was a breach of duty owed to another, (2) the alleged aider and abettor knew of the breach, and (3) they substantially assisted or encouraged the fiduciary in effecting the breach. *Matlack*, 2010 WL 114883, at *11; *Lichtman v. Taufer*, 2004 WL 1632574, at *8 (Pa.Ct.Com.Pl. July 13, 2004). Under New York law, "A claim for aiding and abetting a breach of fiduciary duty requires: (1) a breach by a fiduciary of obligations to another, (2) that the defendant knowingly induced or participated in the breach, and (3) that plaintiff suffered damage as a result of the breach." *Kaufman v. Cohen*, 307 A.D.2d 113, 125, 760 N.Y.S.2d 157 (1st Dep't 2003) (citing *S & K Sales Co. v. Nike, Inc.*, 816 F.2d 843, 847–848 (2d Cir.1987) and *Whitney v. Citibank, N.A.*, 782 F.2d 1106, 1115 (2d Cir. 1986)). Actual knowledge of the breach of fiduciary duty is required, constructive knowledge will not suffice. *Id.* A defendant only knowingly participates in a breach of fiduciary duty "when he or she provides 'substantial assistance' to the primary violator," which "occurs when a defendant affirmatively assists, helps conceal or fails to act when required to do so, thereby enabling the breach to occur." *Id.* at 126.

At all relevant times, AHI was AHA's general partner. General partners owe a fiduciary duty to limited partners. *Alpart v. General Land Partners, Inc.*, 574 F.Supp.2d 491, 500 (E.D.Pa.2008) ("As a matter of social policy, general partners of a limited partnership owe a fiduciary duty to the limited partners.") (applying Pennsylvania law); *In re Grotzinger*, 81 A.D.2d 268, 281, 440 N.Y.S.2d 189 (1st Dep't 1981) (a "managing or general partner of a limited partnership is bound in a fiduciary relationship with the limited partners"). Shah was AHI's president. (Pl. 56.1 Stmt. ¶ 7.)

A corporation is charged with the knowledge of its officers if those officers gain that knowledge while acting within the scope of their employment. *W.C.A.B. v. Evening Bulletin*, 498 Pa. 219, 445 A.2d 1190, 1192 (1982) ("It is well settled in the law of this jurisdiction that knowledge of an agent, acting within the scope of his authority, real or apparent, may be imputed to the principal, and therefore, knowledge of the agent is knowledge of the principal.") (internal citations omitted); *Van Ostrand v. Nat'l Life Assur. Co. of Canada*, 82 Misc.2d 829, 371 N.Y.S.2d 51, 56 (N.Y.Sup.Ct.1975) ("As a general rule, a corporation is not chargeable with knowledge of all that its agents know, but only with those material facts which the agents have received or acquired while acting for the corporation within the scope of their agency and where it is their duty to report their knowledge to the corporation."). AHI is therefore charged with Shah's knowledge regarding the REIT's interest in AHA, and by failing to inform Zaccaro, AHI breached its fiduciary duty to plaintiff. Shah had actual knowledge of this breach.

However, as a matter of discretion and prudence, Zaccaro's motion for summary judgment on this claim is denied without prejudice. This claim arises from the same set of facts as plaintiff's fraud claim, which must be heard by a jury. Zaccaro also seeks punitive damages on this claim. Even if the Court granted partial summary judgment as to Shah's liability on this claim, a jury would have to hear all of the same evidence to determine if punitive damages are appropriate, and if so, the amount. The more prudent course of action is to submit this claim to a jury. *Guglielmo v. Kopald*, No. 05 Civ. 7887(CLB), 2007 WL 1834740, at *3 (S.D.N.Y. June 26, 2007) (denying plaintiff's motion for summary judgment "[a]s a matter of discretion" and stating "[i]f

Plaintiff were granted summary judgment on any of her claims, the matter of damages would still have to be heard by a trial jury. To do this, particularly where punitive damages are sought, it is essential for all of the facts to be set before the jury bearing upon liability"). The Court, of course, retains the power to enter judgment as a matter of law before or after the case has been submitted to the jury. Rule 50(a)(2) & (b), Fed.R.Civ.P.

### VII. *The Defendants' Motions for Summary Judgment Are Granted in Part and Denied in Part*

### A. *Nish and the REIT Are Not Entitled to Summary Judgment on Plaintiff's Aiding and Abetting a Fraud Claim*

In arguing that they are entitled to summary judgment on Zaccaro's fraud claim, the REIT and Nish repeat the unsuccessful notice argument they put forth concerning Zaccaro's aiding and abetting a breach of fiduciary duty claim, substituting Rule 9(b)'s requirements for those of Rule 8(a). For substantially the same reasons stated above, the REIT and Nish's motion for summary judgment on this claim is denied because they had fair notice of plaintiff's claim.

### B. *Defendants Shah, Patel and 3344's Motion for Summary Judgment on Plaintiff's Unjust Enrichment Claim Is Denied*

■ Under both New York and Pennsylvania law, a plaintiff cannot maintain a claim for unjust enrichment when an enforceable contract governs the subject matter of the claim. *IDT Corp. v. Morgan Stanley Dean Witter & Co.*, 12 N.Y.3d 132, 142, 879 N.Y.S.2d 355, 907 N.E.2d 268 (2009). ("Where the parties executed a valid and enforceable written contract governing a particular subject matter, recovery on a theory of unjust enrichment for events arising out of that subject matter is ordinarily precluded."); *Villoresi v. Femminella*, 856 A.2d 78, 84 (Pa.Super.2004), *appeal denied*, ("Where an express contract already exists to define the parameters of the parties' respective duties, the parties may avail themselves of contract remedies and an equitable remedy for unjust enrichment cannot be deemed to exist."). Shah, Patel and 3344 argue that Zaccaro's breach of contract claim precludes him from also asserting an unjust enrichment claim.

Although the parties' arguments only refer to the Partnership Agreement, which governs the relationship between the AHA partners, plaintiff sold his ownership stake in AHA pursuant to the Zaccaro–Nish Assignment Agreement. (Byler Sept. 14 Aff. Exh. 8.) Neither agreement, however, bars Zaccaro from asserting his unjust enrichment claim, because that claim is not based on the defendants' alleged failure to fulfill a contractual obligation. Rather, Zaccaro's unjust enrichment claim arises from allegedly tortious conduct by the defendants, e.g. fraud and aiding and abetting a breach of fiduciary duty. The defendants' motion for summary judgment is denied because neither contract governs the particular subject matter of plaintiff's unjust enrichment claim.

### C. *Defendants' Motion for Summary Judgment on Plaintiff's Request for an Accounting is Granted in Part and Denied in Part.*

Plaintiff seeks an accounting from all defendants. The parties primarily cite Pennsylvania law in their arguments concerning this claim. Plaintiff argues that he is entitled to an accounting under Pennsylvania's Uniform Partnership Act ("UPA"), 15 Pa.C.S.A. § 8301 *et seq.* Section 8335 of the UPA provides in part that "[a]ny partner shall have the right to a formal account as to the partnership affairs. . . ." 15 Pa.C.S.A. § 8335. The UPA,

however, applies to general partnerships. The Pennsylvania Revised Uniform Limited Partnership Act ("PRULPA") applies to limited partnerships such as AHA. Under Section 8525 of the PRULPA:

> Each limited partner has the right, subject to such reasonable standards ... as may be set forth in the partnership agreement, to obtain from the *general partners* from time to time upon reasonable demand: (1) True and full information regarding the state of the business and financial condition of the limited partnership[,] (2) [p]romptly after becoming available, a copy of the Federal, State and local income tax returns for each year of the limited partnership[, and] (3) [o]ther information regarding the affairs of the limited partnership as is just and reasonable.

15 Pa.C.S.A. § 8525 (emphasis added).[4] According to the plain language of Section 8525, a limited partner has the right to demand this information solely from "the general partners" of a partnership. *Id.* AHI was the sole general partner of AHA during the time plaintiff was a limited partner. Zaccaro has no viable claim against any defendant other than AHI because no other defendant was a general partner of AHA.

According to defendants, under Pennsylvania law an accounting is only appropriate if the plaintiff does not possess an adequate remedy at law. *See Rock v. Pyle,* 720 A.2d 137, 142 (Pa.Super.1998) ("An equitable accounting is improper where no fiduciary relationship exists between the parties, no fraud or misrepresentation is alleged, the accounts are not mutual or complicated, or the plaintiff possesses an

adequate remedy at law."). Defendants have not provided any authority to support the argument that this equitable principal applies to Zaccaro's claim pursuant to Section 8525 of the PRULPA. Summary judgment on Zaccaro's accounting claim is granted in favor of all defendants, except AHI. AHI's motion for summary judgment on Zaccaro's accounting claim is denied.

### D. *Plaintiff May Seek Punitive Damages on His Fraud and Breach of Fiduciary Duty Claims*

▮▮▮▮▮ Zaccaro seeks punitive damages on his fraud and breach of fiduciary duty claims. Defendants have moved for summary judgment, seeking an order dismissing this request for relief. Defendants argue that Zaccaro has not come forward with evidence that the defendants' actions were "part of a pattern of gross and wanton fraud aimed at the public in general." (Def. Sum. Judg. Memo. at 18, 20.) Under Pennsylvania law, public harm is not a requirement for an award of punitive damages. Punitive damages are "proper when the act which creates actual damages also imports insult or outrage, and is committed with a view to oppress or is done in contempt of plaintiffs' rights," and "may be given when the act is done with reckless indifference, as well as, bad motive." *Delahanty v. First Pa. Bank, N.A.,* 318 Pa.Super. 90, 464 A.2d 1243, 1263 (Super.1983).

Although under New York law the exact contours of when a plaintiff must prove a "public harm" to recover punitive damages are still undefined, the Second Circuit has recognized that "New York courts have applied the 'public harm' standard only to cases in which the defendant's allegedly

---

4. Provisions of the UPA apply to limited partnerships "except insofar as the statutes relating to [limited partnerships] are inconsistent with [the UPA]." 15 Pa.C.S.A. § 8311(b). I conclude that in this case there is an inconsistency between Section 8525's grant of a right of accounting solely from general partners and Section 8335's right to an accounting from all partners. Therefore, Section 8525 applies to plaintiff's claim.

tortious conduct was directly related to the contract between the plaintiff and defendant." *Carvel Corp. v. Noonan,* 350 F.3d 6, 25 (2d Cir.2003). "[T]he typical fact pattern in which New York courts apply this standard is where the plaintiff claims that the defendant fraudulently misrepresented something about the contract between the two." *Id.* The public harm requirement does not apply because Zaccaro's fraud and breach of fiduciary duty claims do not directly relate to the Partnership Agreement or the Zaccaro–Nish Assignment Agreement. Instead, they arise from alleged misrepresentations and undisclosed matters outside of the contract. The defendants' motion for summary judgment on punitive damages is denied.

CONCLUSION

For the reasons stated above, plaintiff's motion for partial summary judgment (D.E. 59) is DENIED.

The defendants' motion for summary judgment (D.E. 63) is GRANTED in part and DENIED in part. All defendants other than AHI are entitled to summary judgment on plaintiff's request for an accounting, and in all other respects the motion is DENIED.

The defendants' motion to exclude plaintiff's expert report and to preclude plaintiff's expert from testifying at trial (D.E. 66) is GRANTED.

SO ORDERED.